## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**EAGLE VIEW TECHNOLOGIES, INC.**
and **PICTOMETRY INTERNATIONAL CORP.,**

        Plaintiffs,

    v.

**GAF MATERIALS, LLC**,

        Defendant.

**Case No. 1:21-cv-10669-RMB-SAK**

---

## DEFENDANT GAF MATERIALS, LLC'S
## BRIEF IN SUPPORT OF ITS MOTION TO TRANSFER

---

Maureen T. Coghlan
Archer & Greiner, P.C.
One Centennial Square
33 East Euclid Avenue
Haddonfield, NJ 08033

*Attorneys for Defendant GAF Materials, LLC*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

I.      STATEMENT OF FACTS ...........................................................................................3

        A.      The Parties .......................................................................................................3

        B.      The Patents-in-Suit...........................................................................................3

        C.      QuickMeasure Software....................................................................................6

        D.      EagleView's Patent Infringement Lawsuits .....................................................8

II.     THIS MATTER SHOULD BE TRANSFERRED TO THE DISTRICT OF
        UTAH. ........................................................................................................................9

        A.      This Case Could Have Been Brought In the District of Utah...............................9

        B.      The Public & Private Interest Factors Weigh In Favor of Transfer.....................10

                1.      The Private Interest Factors Favor Transfer to the District of Utah. .........10

                        (a)     Plaintiff's forum preference. ........................................................10

                        (b)     Defendant's forum preference........................................................14

                        (c)     Whether the claim arose elsewhere................................................16

                        (d)     The convenience of the parties, with respect to physical and
                                financial condition. ......................................................................17

                        (e)     The convenience of the witnesses..................................................18

                        (f)     The Location of Books and Records................................................19

                2.      The Public Interest Factors Favor Transfer to the District of Utah. ..........20

                        (a)     The enforceability of the judgment................................................20

                        (b)     Practical considerations that could make the trial easy,
                                expeditious, or inexpensive...........................................................20

                        (c)     The relative administrative difficulty in the two fora
                                resulting from court congestion. ...................................................23

(d)   The local interest in having localized interests decided at home.................................................................................24

(e)   The public policies of the fora. ...................................................24

(f)   The familiarity of the trial judge with the applicable law..............25

III.   CONCLUSION.............................................................................................25

# **TABLE OF AUTHORITIES**

Page(s)

## **CASES**

*Avaya v. Mitel Networks Corp.*,
    460 F. Supp. 2d 690 (E.D. Va. 2006) ..............................................................22

*Canon Financial Services, Inc. v. JL Barrett Corp.*,
    No. 10-4117 (RMB/KMW), 2010 WL 4746242 (D.N.J. Nov. 16, 2010) .........................21

*COA Network, Inc. v. J2 Global Communications, Inc.*,
    No. 09–6505 (WJM), 2010 WL 2539692 (D.N.J. June 17, 2010)............................ *passim*

*Continental Grain Co. v. Barge FBL-585*,
    364 U.S. 19 (1960)..........................................................................................21

*Corsentino v. Meyer's RV Centers LLC*,
    No. 20-03287 (FLW), 2020 WL 4199744 (D.N.J. July 22, 2020) ...................................15

*Eon-Net, L.P. v. Drugstore.com, Inc.*,
    No. 05-845 (JCL), 2005 WL 8175900 (D.N.J. Dec. 20, 2005) ........................................17

*Gaetano v. Gilead Sciences, Inc.*,
    No. 21-01418 (KM) (JBC), 2021 WL 3185822 (D.N.J. July 27, 2021).....................18, 19

*Indivior Inc. v. Dr. Reddy's Labs. S.A.*,
    No. 17-7106 (KM) (CLW), 2018 WL 4089031 (D.N.J. Aug. 27, 2018)....................12, 13

*Intendis, Inc. v. River's Edge Pharmaceuticals, LLC*,
    No. 11-2838 (FSH) (PS), 2011 WL 5513195 (D.N.J. Nov. 10, 2011) ..............................14

*Interlink Products International, Inc. v. Fan Fi International, Inc.*,
    No. 16-1142 (MCA) (LDW), 2017 WL 1362789 (D.N.J. Apr. 7, 2017) ...................12, 13

*Internal Combustion Solutions, LLC v. Yoshimura Research & Development of America Inc.*,
    No. 13-02793 (RMB/AMD),
    2014 WL 1391178 (D.N.J. Apr. 9, 2014) .............................................................11, 14, 20

*Jumara v. State Farm Insurance Co.*,
    55 F.3d 873 (3d Cir. 1995).................................................................................10

*Kabushiki Kaisha v. Lotte International America Corp.*,
    No. 15-5477 (MCA) (LDW), 2017 WL 4269457 (D.N.J. Sept. 26, 2017) .................15, 16

*LifeCell Corp. v. Lifenet Health*,
    No. 15-6701 (CCC), 2016 WL 544489 (D.H.J. Feb. 9, 2016), *aff'd*, 2016 WL
    3545752 (D.N.J. June 28, 2016) ........................................................................18

*Liggett Group Inc. v. R.J. Reynolds Tobacco Co.*,
    102 F. Supp. 2d 518 (D.N.J. 2000) ...................................................................................9

*Medidata Solutions, Inc. v. Datatrak International, Inc.*,
    No. 12-4748 (WJM), 2013 WL 1989854 (D.N.J. May 13, 2013) ........................20, 21, 22

*ML Design Group, LLC v. Young Manufacturing Co.*,
    No. 12-5883, 2013 WL 3049174 (D.N.J. June 17, 2013).....................................10, 12, 24

*Quintiles IMS Inc. v. Veeva Systems, Inc.*,
    No. 17-177 (CCC), 2017 WL 2766166 (D.N.J. June 23, 2017) ........................................13

*Reckitt Benckiser Pharmaceuticals., Inc. v. Biodelivery Sciences International, Inc.*,
    No. 14-5892 (MAS) (TJB), 2015 WL 4461511 (D.N.J. July 21, 2015).....................22, 24

*Refined Recommendation Corp. v. Netflix, Inc.*,
    No. 07-CV-04981 (DMC), 2008 WL 474106 (D.N.J. Feb. 15, 2008) .............................17

*Telebrands Corp. v. Mopnado*,
    No. 14-7969 (JLL) (JAD), 2016 WL 368166 (D.N.J. Jan. 12, 2016), *adopted by*,
    2016 WL 355072 (D.N.J. Jan. 28, 2016) .........................................................................16

*Teva Pharmaceuticals USA, Inc. v. Sandoz Inc.*,
    No. 17-275-FLW, 2017 WL 2269979 (D.N.J. May 23, 2017) ................................. *passim*

*In re TS Tech USA Corp.*,
    551 F.3d 1315 (Fed. Cir. 2008)........................................................................................25

*Yang v. Odom*,
    409 F. Supp. 2d 599 (D.N.J. 2006) ...................................................................................9

## STATUTES

28 U.S.C. § 1404(a) .................................................................................................................1, 9

## PRELIMINARY STATEMENT

Plaintiffs Eagle View Technologies, Inc. ("EagleView") and Pictometry International Corp. ("Pictometry") allege that Defendant GAF Materials, LLC ("GAF") has infringed nine patents by making and using QuickMeasure roof reports, and by using software to generate those reports ("QuickMeasure Software").  Pursuant to 28 U.S.C. § 1404(a), GAF respectfully requests that this case be transferred to the District of Utah.

GAF recognizes that it is unusual for a New Jersey-based defendant to seek transfer from New Jersey to Utah, particularly when GAF has sought transfer to this District in at least one prior patent case.  But Utah is a much more convenient location for this litigation based on the following unique circumstances:

- *Third-Parties Outside New Jersey Designed the QuickMeasure Software And Produce QuickMeasure Reports.*  GAF does not make QuickMeasure reports, did not design or develop any of the QuickMeasure Software, and has never maintained or controlled any of the QuickMeasure Software.  Instead, QuickMeasure reports are generated through a partnership between Utah-based Nearmap US Inc. ("Nearmap") and Minnesota-based Primitive LLC (d/b/a Pushpin) ("Pushpin").  QuickMeasure reports are white-labeled by GAF, but GAF's role is essentially limited to sales and marketing of those reports.

- *Most Relevant Witnesses Are Located Outside of New Jersey.*  Because of GAF's limited role in the design, development, and maintenance of the accused QuickMeasure technology, there are likely to be very few relevant witnesses located in this District.  By contrast, most relevant witnesses are likely to be located either in Utah or closer to Utah than to New Jersey.  In particular, several critical non-party witnesses are not subject to compulsory process in this District, and therefore could not be compelled to testify at trial here.

- *Plaintiffs Are Pursuing Parallel Litigation in Utah On Many of the Same Patents.* On the same day that Eagleview filed this suit against GAF, Eagleview filed another infringement suit in the District of Utah against Nearmap.  *Eagle View Techs. et al. v. Nearmap US, Inc.*, No. 2:21-cv-283-TS-DAO (D. Utah) ("the Utah Action").  In the Utah Action, Eagleview asserts six of the same nine patents that it asserts here.  Nearmap has already responded to Eagleview's complaint in Utah, and has not sought transfer.  Unless this case is transferred to Utah, there is a substantial risk of inconsistent judgments and inefficient duplication of judicial expenditures, even just on the motions that have been filed to date (including a

partial motion to dismiss filed in the Utah Action and GAF's concurrently filed motion to dismiss in this action, both of which seek dismissal of some of the same claims based on Section 101).

GAF also recognizes that this Court has invested substantial resources in a prior patent infringement suit brought by Plaintiffs against unrelated defendants, during which the Court undoubtedly became familiar with the parties and issues in that proceeding. *See Eagle View Techs., Inc., et al. v. Xactware Solutions, Inc.*, No. 1:15-cv-07025 (D.N.J.) ("the *Xactware* Action"). While there is overlap between the issues in the *Xactware* Action and those presented here, any efficiencies attributable to that fact are likely to be limited because:

- *Only Three of the Patents Asserted During the* Xactware *Trial Are Asserted Here.* Plaintiffs have been prolific at obtaining patents, with a portfolio that appears to have swelled into the hundreds. Yet, of the nine patents asserted by Plaintiffs against GAF, only three of them were asserted in the *Xactware* trial—and ***none*** of the particular claims asserted against GAF was asserted at the *Xactware* trial. Moreover, this case introduces a new patent family—with different inventors, a different assignee, and different subject-matter—that this Court did not address in any of the *Xactware* orders or during the *Xactware* trial.

- *Different Defendants And Accused Products Were At Issue in* Xactware. This case involves different accused products that were not at issue in the *Xactware* Action, has none of the unique factual circumstances relating to the failed merger attempt between the parties in *Xactware*, and introduces the complication of multiple third-parties and non-party witnesses—all based outside of this jurisdiction. GAF had no involvement in the *Xactware* Action.

- *There Were No Parallel District Court Actions During The* Xactware *Case.* During the time that the *Xactware* Action was pending, Plaintiffs did not file any other patent infringement lawsuits, so this Court was the only one expending judicial resources relating to Plaintiffs' patents. That is not the case anymore. Any gains in efficiencies from the Court's experience with one-third of the Patents-in-Suit are outweighed by the inefficiencies of having two courts simultaneously invest resources to adjudicate patent infringement allegations relating to two-thirds of the patents asserted against GAF, with the concurrent risk of inconsistent judgments between this District and the District of Utah.

For the foregoing reasons, and those discussed in greater detail below, it would be much more convenient and efficient for this Court to transfer this case to Utah.

## I.     STATEMENT OF FACTS

### A.     The Parties

Plaintiff Pictometry is a Delaware corporation with its principal place of business

allegedly in Rochester, New York.  (First Am. Compl. ("FAC") ¶ 5.)  Plaintiff Eagleview is a

Washington state corporation that also alleges that its principal place of business is in Rochester,

New York.  That is not what Eagleview said in the *Xactware* Action, when Eagleview claimed

that its principal place of business was in Bothell, Washington.  (*See Xactware* Action, D.I. 30, ¶

2.)  A principal place of business in Washington would also be consistent with Eagleview's

website, which identifies Eagleview's corporate headquarters in the state of Washington.[1]

Plaintiff Eagleview claims to have "developed . . . products and technologies that produce

aerial roof and wall measurement reports," while Plaintiff Pictometry claims to have been "an

innovator of, among other things, aerial oblique image capture and processing technologies."

(FAC ¶¶ 4, 5.)  At the *Xactware* trial, Rishi Daga, Plaintiffs' CEO, described Eagleview as "a

data analytics company."  (Transcript of Jury Trial at 706:1, *Eagle View Techs., Inc. v. Xactware

Sols., Inc.*, No. 1:15-cv-07025 (D.N.J. Sept. 11, 2019), Dkt. No. 805 at 112.)  GAF, unlike

Plaintiffs, is primarily a roofing manufacturer, which is based in Parsippany, New Jersey.  (FAC,

Ex. 14.)  Prior to the filing of this action, EagleView had never asserted a claim of patent

infringement against GAF.  (Laddha Decl. at ¶ 3.)

### B.     The Patents-in-Suit

On May 4, 2021, Plaintiffs filed their Complaint against GAF asserting infringement of

United States Patent Nos. 8,078,436 ("the '436 patent"); 8,170,840 ("the '840 patent"); 8,209,152

("the '152 patent"); 8,542,880 ('the '880 patent"); 8,670,961 ("the '961 patent"); 9,129,376 ("the

---

[1]     *See Eagleview,* https://www.eagleview.com/contact-us/ (last visited Aug. 9, 2021).

'376 patent"); 9,514,568 ("the '568 patent"); 10,528,960 ("the '960 patent"); and 10,685,149 ("the '149 patent") (collectively, "Patents-in-Suit").  On July 23, 2021, Plaintiffs filed their amended complaint.  The Patents-in-Suit are drawn from three separate families, each of which has different inventors.  The first family includes the '840, '152, '376, and '149 patents, which name Chris Pershing as the sole inventor and which are assigned to Eagleview.  The '436, '961, '568, and '960 patents are from a different family assigned to Eagleview and name David P. Carlson and Chris Pershing as co-inventors.  The '880 patent is from yet another family, names Dale Thornberry, Chris Thornberry, and Mark F. Garringer as inventors, and is assigned to Pictometry.  Although the FAC accuses "QuickMeasure reports" of infringement, none of the claims addressed in the FAC is directed to a "report" itself.  Instead, all of those claims are directed to methods, systems, and/or non-transitory computer-readable storage media.  For instance, claim 1 of the '880 patent is a process claim that makes no mention of any "reports," and instead relates to automated image retrieval from a database:

> 1. A **<u>process</u>** for determining attributes of a roof structure of a real-world three-dimensional building, comprising the acts of:
>
> providing at least one computer input field for a user to input first location data generally corresponding to the location of the building;
>
> providing visual access to **<u>an aerial image</u>** of a region including the roof structure of the building corresponding to said first location data, the aerial image taken from a straight down overhead view with respect to the roof structure;
>
> on the aerial image of the region, providing a visual marker that is moveable on a computer monitor around said region, said visual marker initially corresponding to said first location data, wherein said visual marker may be moved to a final location on top of the building to more precisely identify the location of the building roof structure, the final location having location coordinates;
>
> providing a computer input capable of signaling user-acceptance of the final location of said marker; and,

providing visual access to one or more oblique images of an **aerial imagery database** corresponding to location coordinates of the final location.[2]

In a similar vein, dependent claim 10 of the '152 patent is likewise not directed to a report itself, but instead claims a computer-implemented process consisting of a series of steps for generating a report—such as "displaying," "registering," and "modifying"—that must be satisfied in order to fall within the scope of the claimed method:

> 1. A computer-implemented **method** for generating a roof estimate report, the method comprising:
>
> **displaying a first and a second aerial image** of a building having a roof, each of the aerial images providing a different view of the roof of the building;
>
> **receiving an indication of a feature** of the building shown in the first aerial image;
>
> **modifying a three-dimensional model** of the roof based on the received indication of the feature of the building; and
>
> **displaying a projection of the feature** from the modified three-dimensional model onto the first and second aerial images as a line drawing of the feature, each overlaid on corresponding locations of the feature on the first and second aerial images.
>
> 10. The method of claim 1 further comprising:
>
> **displaying a marker** operable to specify a point on an image;
>
> **receiving, via the marker,** an indication of a point on the first aerial image; and
>
> **registering**, based on the received indication of the point, the aerial image **to a reference grid** corresponding to the three-dimensional model.

As another example, claim 1 of the '961 patent is directed not to a report itself, but rather claims a computer-implemented multi-step process involving computer "modules" and "processors" that are utilized to generate a report:

> 1. A process comprising:
>
> receiving, by at least one computer processor that includes a calibration module stored in a non-transitory memory coupled to the at least one processor, a plurality

---

[2]   All emphasis herein has been added unless otherwise noted.

of aerial image fields of a building having a roof including a first aerial image file taken from a first viewpoint of the building a second aerial image filed taken from a second viewpoint of the building different than the first viewpoint, wherein at least one of the first aerial image file and the second aerial image file has calibration information associated with the at least one of the first aerial image file and the second aerial image file;

determining, by any of the at least **one computer processor**, a pitch and an area of one or more roof sections of the roof based on an image analysis performed on the plurality of aerial image files, wherein the image analysis comprises:

constructing a three dimensional model of one or more roof sections by:

calibrating at least one of the first and second aerial image files using the calibration information associated with the at least one of the first aerial image file and the second aerial image file to convert a distance in pixels between two points on the respective aerial image file into a physical length;

identifying common reference points depicted in at least the first aerial image file and the second aerial image file;

identifying, for all such reference points, a location in three-dimensional space by triangulating the reference points by projecting a first line originating from the first viewpoint through one of the reference points and a second line originating from the second viewpoint through the same reference point and determining an intersection of the first and second lines; and

determining physical length between at least two of the reference points in three-dimensional space based at least in part on the calibration;

generating, by any of the at least one computer processor a roof report that includes the pitch and the area of the one or more roof sections based on the determined pitch and area of the one or more roof sections wherein the roof report is useful as a guide to repair or replace the roof of the building, where in the pitch is indicative of a vertical rise of a roof section over a horizontal run of the roof section; and

outputting the roof report having the determined pitch therein.

### C.   QuickMeasure Software

Plaintiffs' infringement allegations are limited to QuickMeasure reports and the

QuickMeasure Software that is used to make them.  (FAC ¶ 1.)  GAF first began selling

QuickMeasure reports in 2019.  (Declaration of Vishal Laddha, hereafter "Laddha Decl.," at ¶ 6.)

QuickMeasure reports are marketed to GAF roofing contractors as affordable, accurate, and fast

roof measurements that can be provided "in under 1 hour." (FAC, Ex. 16.) These reports are based on a "complete aerial roofing measurement software." (*Id.*) But GAF itself does not create, modify, or otherwise generate QuickMeasure reports, and that "complete aerial roof measurement software" has been owned at all times by Utah-based Nearmap and/or Minnesota-based Pushpin. (*See* Laddha Decl. at ¶¶ 5, 6, 9, 12.) GAF's business relationship with Nearmap and/or Pushpin has been handled at all times by Vishal Laddha, who has submitted a declaration in support of this motion. (*Id.* at ¶ 6.)

The generation of QuickMeasure reports depends on the use of certain aerial imagery, but GAF does not and has never captured any of that aerial imagery; rather, GAF's understanding is that such aerial images are captured and maintained by Nearmap. (Laddha Decl. at ¶ 7.) The generation of QuickMeasure reports also involves certain computer-based roof geometries, but GAF does not create, modify, or generate any meshes, models, or roof geometries that may be used in connection with QuickMeasure reports, and has never done so. (*Id*. at ¶¶ 8, 9.)

The development of the software, hardware, databases, and algorithms relating to the generation of QuickMeasure reports was managed by Nearmap and/or Pushpin; GAF did not directly participate in any such development. (Laddha Decl. at ¶ 8.) GAF also did not create and does not even have ***access*** to the source code, specifications, schematics, formulas, or other documentation that would show the structure and operation of the systems and software that create QuickMeasure reports. (*Id*. at ¶ 10.) To the extent any of those documents or other information concerning the design, development, and modification of QuickMeasure Software exist, they are likely to be in the possession of Nearmap and/or Pushpin (and in any event are not accessible to GAF). (*Id*.) As such, the individuals with the most relevant knowledge about the infringement allegations are likely to be current and former employees and officers of Nearmap

7

and/or Pushpin. (*Id.* at ¶¶ 11, 15-18.) Those employees include Amanda Marchetti, Nearmap's product manager in South Jordan, Utah, and Tony Agresta, Nearmap's VP of Sales for North America, in South Jordan, Utah. Both of those individuals are within the subpoena power of the federal court in Utah. (*Id.* at ¶ 15.) In addition, other Nearmap employees, such as John Ford, who is based in Seeley Lake, Montana, and who has been Mr. Laddha's principal point of contact, would be more likely to be compelled to testify at trial in Utah, given that his employer is headquartered there. (*Id.*) Similarly, any Nearmap employees or officers who are based in Australia, and who GAF understands have had direct involvement in the technology relating to QuickMeasure, (*see id.*), would be more likely to be compelled to testify at trial in Nearmap's home state than in this District.

### D.       EagleView's Patent Infringement Lawsuits

On the same day that they filed this action, Plaintiffs also filed the Utah Action against Nearmap, in which Plaintiffs assert six of the same patents as they do here: the '152, '880, '961, '568, '960, and '149 patents.[3] Plaintiffs acknowledge that the Utah Action is related to this case. (FAC at pg. 140.) Nearmap has filed a partial motion to dismiss in the Utah Action based on at least some of the same grounds that GAF has asserted in its concurrently filed motion to dismiss.

Eagleview previously asserted some claims of the Patents-in-Suit at trial in the *Xactware* Action: claims 2 and 36 of the '436 patent, claim 10 of the '840 patent, and claim 20 of the '376 patent. (*See* FAC, Ex. 10 at 6 n.4.) In addition, the '152 patent had been asserted at one point in the *Xactware* Action, but "[t]he parties resolved all of their disputes concerning the '152 [p]atent

---

[3]     Plaintiffs also assert two additional patents in the Utah Action: U.S. Patent Nos. 8,593,518 and 9,135,737.

prior to trial." (*Id.* at 5-6 n.2.)  The *Xactware* Action is currently on appeal to the Federal

Circuit, with a decision on that appeal likely to come sometime in 2022.

## II.    THIS MATTER SHOULD BE TRANSFERRED TO THE DISTRICT OF UTAH.

Section 1404(a) permits transfer "[f]or the convenience of parties and witnesses, [and] in

the interest of justice." 28 U.S.C. § 1404(a).  "The purpose of section 1404(a) is to protect

litigants, witnesses, and the public against unnecessary inconvenience and expense." *Teva*

*Pharms. USA, Inc. v. Sandoz Inc.*, No. 17-275-FLW, 2017 WL 2269979, at *4 (D.N.J. May 23,

2017) (citing *Liggett Grp. Inc. v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518, 525-26

(D.N.J. 2000)).  The two-part transfer inquiry asks: (1) whether the case could have been brought

in the proposed transferee district and, if so, (2) whether "transfer is in the interests of justice and

convenience." *Id.* at *4.  This case could have been brought in the District of Utah, and transfer

to that District is in the interests of both justice and convenience.

### A.    This Case Could Have Been Brought In the District of Utah.

A case could have been brought in a transferee district if that district has "(1) subject

matter jurisdiction over the claims; (2) personal jurisdiction over the parties; and (3) is a proper

venue." *Teva Pharms. USA, Inc.*, 2017 WL 2269979, at *5 (quoting *Yang v. Odom*, 409 F. Supp.

2d 599, 604 (D.N.J. 2006)).  The District of Utah satisfies all three of those criteria.

The District of Utah, like all federal courts, has federal question subject matter

jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a).  (FAC ¶ 39.)  In addition,

GAF is subject to personal jurisdiction in the District of Utah by virtue of its regular and

established place of business in Cedar City, Utah.  This 541,000-square-foot manufacturing plant

sits on 78 acres, and is where dozens of GAF employees are based.  (Laddha Decl. at ¶ 3.)  GAF

also regularly sells QuickMeasure reports in the District of Utah.  (*Id.*)  As such, the District of

Utah is a proper venue for this lawsuit, and it could have been brought there.

**B.      The Public & Private Interest Factors Weigh In Favor of Transfer.**

Because this case could have been brought in the District of Utah, the next question is

whether transfer to that District is in the interests of justice and convenience.  *See Teva Pharms.*,

2017 WL 2269979, at *5.  Although courts assess whether transfer is appropriate based on the

unique facts of each case, the Third Circuit has outlined six "private" interest and six "public"

interest factors to consider.  *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879-80 (3d Cir. 1995).

The private interest factors are:

> [a] plaintiff's forum preference as manifested in the original choice; [b] the defendant's preference; [c] whether the claim arose elsewhere; [d] the convenience of the parties as indicated by their relative physical and financial condition; [e] the convenience of the witnesses – but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and [f] the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

*Id.* at 879.  The public interest factors are:

> [a] the enforceability of the judgment; [b] practical considerations that could make the trial easy, expeditious, or inexpensive; [c] the relative administrative difficulty in the two fora resulting from court congestion; [d] the local interest in deciding local controversies at home; [e] the public policies of the fora; and [f] the familiarity of the trial judge with the applicable state law in diversity cases.

*Id.* at 879-80.  All of the foregoing factors either weigh in favor of transfer or are neutral.

1.      <u>The Private Interest Factors Favor Transfer to the District of Utah.</u>

**(a)   Plaintiffs' forum preference.**

Although a plaintiff's forum preference is typically accorded deference, that deference

carries less weight when the plaintiff selects a forum outside of its home state, and where "the

operative facts giving rise to the claim occurred outside of the forum chosen by the plaintiff."

*Teva Pharms.*, 2017 WL 2269979, at *5; *see also ML Design Grp., LLC v. Young Mfg. Co.*, No.

12-5883, 2013 WL 3049174, at *3 (D.N.J. June 17, 2013) (transferring patent case to Kentucky

and noting that "[i]f a Plaintiff files suit outside its home state, a lack of 'operative events' in the

forum state subjects Plaintiff's forum choice to a particularly 'high risk of being overridden'"

(citations omitted)).  In patent infringement cases, the "operative facts" generally concern the

"center of gravity" relating to the accused product, which is "the location of the product's

development, testing, research, and production, as well as where marketing decisions are made."

*Teva*, 2017 WL 2269979 at *6 (citation omitted); *see also Internal Combustion Sols., LLC v.

Yoshimura Rsch. & Dev. of Am. Inc.*, No. 13-02793 (RMB/AMD), 2014 WL 1391178, at *3

(D.N.J. Apr. 9, 2014) (transferring patent case to California after determining that all "of [the]

allegedly infringing products were designed, developed, and tested" outside of New Jersey).

      Here, Plaintiffs have sued outside their home states—and the state of Washington, which

appears to be the actual home state for Plaintiff Eagleview, is much closer to the transferee

forum than it is to New Jersey.[4]  Moreover, the only QuickMeasure "events" that have ever

occurred in New Jersey relate to sales and marketing.[5]  The research, development, testing, and

operation of the QuickMeasure Software all have taken place outside this forum.  (Laddha Decl.

at ¶ 12.)  Under these circumstances, the "center of gravity" for this case lies outside of the

District of New Jersey, and Plaintiffs' forum preference is entitled to much less deference.  *See,

e.g.*, *ML Design Grp.*, 2013 WL 3049174, at *3 (concluding that "Defendants' advertising and

---

[4]    Moreover, Eagleview's Vice President of Sales, Hugh West, testified during the *Xactware* trial that he has lived his entire life in Salt Lake City, in the District of Utah.  (Transcript of Jury Trial at 1461:16-19, *Eagle View Techs., Inc. v. Xactware Sols., Inc.*, No. 1:15-cv-07025 (D.N.J. Sept. 13, 2019), Dkt. No. 808 at 232.)  Thus, one of the four fact witnesses who testified on Eagleview's behalf in the *Xactware* Action is based in the transferee forum.

[5]    In its pre-motion response, Eagleview contends that "GAF's purportedly 'limited' role in the development of its infringing software is belied by its public statements" that Mr. Laddha made in a recent webinar.  (Dkt. No. 27 at 2 n.6.)  As Mr. Laddha clarifies in his declaration, Eagleview has taken those comments out of context, and mischaracterized GAF's actual role in the development of QuickMeasure.  (*See* Laddha Decl. at ¶¶ 7-8.)

*(cont'd)*

sales are insufficient to require substantial deference to Plaintiff's forum choice when [the transferee forum is] where the alleged infringing activities are taking place").[6]  Thus, the first private interest factor weighs in favor of transfer.

In response to GAF's pre-motion letter, Eagleview cited several cases for the proposition that its "forum selection [is entitled] to substantial deference and is ***alone dispositive of this . . . motion***." (Dkt. No. 27 at 2 (emphasis added).)  Eagleview mischaracterizes the cases that it cites, as well as the *Jumara* calculus more broadly, under which no single factor is "alone dispositive."  For instance, Eagleview's reliance upon *Indivior Inc. v. Dr. Reddy's Labs. S.A.*, No. 17-7106 (KM) (CLW), 2018 WL 4089031, at *3 (D.N.J. Aug. 27, 2018), is misplaced.  While the Court denied a motion to transfer to the District of Delaware in *Indivior*, the Court never concluded that the plaintiff's choice of forum was "alone dispositive," as Eagleview incorrectly contends.  Instead, the Court based its decision on:  (1) the fact that multiple defendants "did not meet the requirements of § 1404(b) for the purposes of establishing residency in Delaware," and thus it did not appear that the "plaintiff could have brought the action in the transferee district as of the time of the action's commencement," unlike here, where Eagleview apparently concedes that this action could have been brought in the transferee forum; (2) the close proximity of Delaware to New Jersey, which made it unlikely for transfer to result in more efficient

---

6 The facts here are distinguishable from *Interlink Prods. Int'l, Inc. v. Fan Fi Int'l, Inc.*, No. 16-1142 (MCA) (LDW), 2017 WL 1362789 (D.N.J. Apr. 7, 2017), which Eagleview cited in its pre-motion response.  (*See* Dkt. No. 27 at 2.)  In *Interlink*, the movant failed to provide any information that was specific to the "allegedly infringing diverter device," and instead just "averred generally that their research, design, and development activities occur in Nevada."  2017 WL 1362789, at *4.  Here, GAF has provided information specific to the allegedly infringing reports and technology.  Moreover, while there did not appear to be any third-parties involved in the research, design, or development of the allegedly infringing products in *Interlink*, here at least Utah-based Nearmap has been directly involved in those activities.  The *Interlink* case also involved several non-patent claims that more directly implicated the activities that occurred in New Jersey—no such claims or facts are present here.  *See id.*

proceedings; and (3) the Court's prior grant of a preliminary injunction against the moving defendants in that case—relief which Eagleview has not sought here. *Id.* at *2-3. Similarly misplaced is Eagleview's reliance on *Interlink*, in which the Court specifically "note[d] that the deference owed to Plaintiff's choice of this District as forum is bolstered by the fact that Plaintiff is incorporated and has its principal place of business within this district." *Interlink*, 2017 WL 1362789, at *4. By contrast, the plaintiffs here are not incorporated in New Jersey, and their principal places of business lie outside this District. And finally, Eagleview cites a non-patent case that is distinguishable in multiple respects. (Dkt. No. 27 at 2 (citing *Quintiles IMS Inc. v. Veeva Sys., Inc.*, No. 17-177 (CCC), 2017 WL 2766166 (D.N.J. June 23, 2017).) For instance, the *Quintiles* Court noted that transfer of that case to California would merely "shift[] the inconvenience from the party being sued to the party suing." 2017 WL 276616, at *5. But in this case, as discussed below, the District of Utah is likely to be *more* convenient for multiple likely Eagleview witnesses. As another critical point of distinction, there were no overlapping claims pending in the transferee forum in *Quintiles*, and thus the Court concluded that none of the public interest factors supported transfer to California. *Id.* at *6. Here, the Utah Action was filed by Eagleview on the same day as this action, asserting six of the same patents.

In its pre-motion response, Eagleview also dismisses "GAF's 'manufacturing facility' in Utah [a]s irrelevant, as it makes roof insulation, not software for generating roof reports." (Dkt. No. 27 at 2.) As an initial matter, the presence of that manufacturing facility in the transferee forum is directly relevant to the question of whether this action could have been brought in Utah, as discussed above. And Eagleview's statement only underscores that the center of gravity in this case relates to the "software for generating roof reports," not the manufacture of any roofing products. GAF wholeheartedly agrees. There is no GAF facility—in New Jersey, Utah, or

13

elsewhere—that "makes . . . software for generating roof reports." (*See* Laddha Decl. at ¶ 8.)
The software for generating QuickMeasure roof reports was "made" by third-parties, including
Utah-based Nearmap, and thus GAF agrees with Eagleview's position that the place where the
relevant software was developed is a critical consideration here. (*Id.*)

#### (b) Defendant's forum preference.

GAF's forum preference favors transfer to the District of Utah. In connection with this
factor, this Court has determined that when the "central facts" of a lawsuit are "primarily
connected" to the transferee forum, that weighs in favor of transfer. For instance, in *Internal
Combustion Solutions, LLC*, this Court granted a motion to transfer to California in part because
"all of [the] allegedly infringing products were designed, developed, and tested in or around" the
transferee forum, and "all witnesses with knowledge of the allegedly infringing activities, and
anyone with knowledge of the design and manufacture" are located in the transferee forum.
2014 WL 1391178, at *3. As discussed above, the "central facts" of this lawsuit have a direct
connection to Utah, given GAF's understanding that Utah-based Nearmap is involved in the
design, development, and testing of the QuickMeasure Software, and in using that software to
generate QuickMeasure reports. (Laddha Decl. at ¶¶ 7-11.)

Moreover, this Court has typically accorded more weight to the defendant's preference
where there is a related case pending in the transferee forum. *See Teva Pharms.*, 2017 WL
2269979, at *6 (finding that the existence of "several related method-of-manufacturing cases . . .
currently pending before" the transferee court, "involving the same parties and claims as the
present case, including actions filed by Plaintiffs," favored transfer); *Intendis, Inc. v. River's
Edge Pharms., LLC*, No. 11-2838 (FSH) (PS), 2011 WL 5513195, at *3 (D.N.J. Nov. 10, 2011)
(noting that where plaintiffs have "demonstrated their willingness to litigate" in the transferee
forum, the second *Jumara* factor "weighs in favor of transfer"). Here, Plaintiffs filed suit against

14

Nearmap—an entity that GAF understands is directly involved in the research, development, testing, and operation of QuickMeasure Software and in the production of QuickMeasure reports—on the same day as it filed this suit, asserting six of the nine Patents-in-Suit.  The Utah Action is at roughly the same stage as this case, both of which have initial motions pending.  By contrast, the *Xactware* Action is at a vastly different stage, does not involve any of the same defendants or accused products as this action or the Utah Action, and is currently on appeal. GAF's preference to litigate this case in Utah—where there is a related case at relatively the same stage as this one—should therefore be entitled to substantial weight.

In support of its assertion that the "center of gravity" for this litigation arises in this District, Eagleview tellingly turns in its pre-motion response to non-patent cases, both of which use inapposite, subject-matter-specific tests to analyze non-patent claims.  (Dkt. No. 27 at 3.) For instance, in *Corsentino v. Meyer's RV Ctrs. LLC*, No. 20-03287 (FLW), 2020 WL 4199744 (D.N.J. July 22, 2020), the Court was faced with claims for breach of contract and breach of warranty, along with business torts.  *Id.* at *1.  Because the claims in *Corsentino* were all governed by forum-selection clauses, the Court "therefore [did not need to] conduct an independent private interests inquiry," and did not consider this particular *Jumara* factor at all. *Id.* at *4.  Instead, as part of the public interest analysis, the Court noted that "[i]In contract disputes . . . the Court determines where the claims arose based on 'where the contract was negotiated or executed, where the contract was to be performed, and where the alleged breach occurred.'"  *Id.* at *5.  That contract-specific analysis does not apply to the patent claims at issue here.  Similarly, in *Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, No. 15-5477 (MCA) (LDW), 2017 WL 4269457 (D.N.J. Sept. 26, 2017), the Court considered where a trademark infringement claim arose.  A very particular test is used for that inquiry:  "trademark infringement claims are

deemed to arise where the 'passing off' occurs, or where the allegedly infringing products are sold to consumers who may become confused." *Id.* at *3. That test is not used for patent claims. That Eagleview was forced to look to inapplicable tests for inapposite claims in its pre-motion response only confirms that under the proper test, the claims here arise outside of this District.

(c)    <b>Whether the claim arose elsewhere.</b>

This case is about software, and the computer architecture associated with it. GAF is not a software company, but Plaintiffs, Nearmap, and Pushpin all are. (*See, e.g.*, Transcript of Jury Trial at 706, *Eagle View Techs., Inc. v. Xactware Sols., Inc.*, No. 1:15-cv-07025 (D.N.J. Sept. 11, 2019), Dkt. No. 805 at 112; *see also generally* Laddha Decl.) The questions of infringement are likely to turn at least in part on the particular computer code that is used to generate QuickMeasure reports, but that code was created outside of New Jersey, and is outside of GAF's possession, custody or control. (Laddha Decl. at ¶¶ 10, 11.) GAF's understanding is that this code is likely to be in the possession, custody, or control of Utah-based Nearmap.[7] (*Id.*) Those questions are also likely to turn on the particular steps that the QuickMeasure Software performs—whether and to what extent roof pitch is calculated, whether and to what extent a 3D model is created and/or modified using aerial images, whether and to what extent images are

---

[7]    In its pre-motion response, Eagleview criticizes GAF for relying on "vague, unsupported speculation" relating to Nearmap and Pushpin. (Dkt. No. 27 at 2.) But Eagleview ignores the fact that GAF cannot know for absolute certain the precise nature of a third-party's activities that were performed without GAF's direct control or input. GAF has attempted in good faith to set forth the facts that it is aware of, but it is not privy to the confidential and proprietary information of the third-party entities that actually developed the software and systems that are used to produce QuickMeasure reports. That distinguishes the present facts from those in *Telebrands Corp. v. Mopnado*, No. 14-7969 (JLL) (JAD), 2016 WL 368166 (D.N.J. Jan. 12, 2016), *adopted by*, 2016 WL 355072 (D.N.J. Jan. 28, 2016), which Eagleview cited in its pre-motion response. (Dkt. No. 27 at 2.) In *Mopnado*, the defendant relied on "vague, unsupported speculation ***regarding the relative financial condition of the parties***." 2016 WL 368166 at *11 (emphasis added). No third-party information was at issue relating to the non-patent claims asserted in *Mopnado*.

16

calibrated, correlated, or registered as part of this process, etc.  (*See, e.g.*, '152 patent, claims 1 and 10; '961 patent, claim 1.)  But GAF does not perform any such steps, and they are not performed by anyone in New Jersey.  GAF branding appears on QuickMeasure reports, and GAF markets, sells, and takes orders for those reports—but the operative facts relating to the process and systems that are used to create those reports all arise outside of this District.  (Laddha Decl. at ¶¶ 7-11.)  Indeed, GAF's understanding is that all of the equipment, including any servers, databases, and other computer-related systems for creating a QuickMeasure report are outside of New Jersey.  (*Id.* at ¶ 12.)

Under those circumstances, Plaintiffs' claims "arise" outside of this District.  *See, e.g.*, *Refined Recommendation Corp. v. Netflix, Inc.*, No. 07-CV-04981 (DMC), 2008 WL 474106, at *4 (D.N.J. Feb. 15, 2008) (transferring case to California in part based on the fact that all of the "servers, processors, [and] databases" relating to the infringement allegations were located there); *see also Eon-Net, L.P. v. Drugstore.com, Inc.*, No. 05-845 (JCL), 2005 WL 8175900, at *3 (D.N.J. Dec. 20, 2005) (transferring patent case to Washington, where the defendant maintained its "internal computer servers and hosting servers").  Because Plaintiffs' claims did not arise in this District, this factor weighs in favor of transfer.

**(d)   The convenience of the parties, with respect to physical and financial condition.**

While GAF is based in this District, Plaintiffs are not.  Because all parties have apparently contemplated litigation outside their home forum (and Plaintiffs have simultaneously been pursuing cases involving the same six patents in both New Jersey and Utah), it appears that all parties have the physical and financial condition to litigate either in the District of Utah or in this forum.  This factor is therefore neutral.

17

(e)    **The convenience of the witnesses.**

This factor weighs strongly in favor of transfer.  The Third Circuit examines the convenience of the witnesses only to the extent they are unavailable or unable to be produced, absent any compulsory mechanisms, and this is potentially the "single most important factor" in the *Jumara* analysis.  *LifeCell Corp. v. Lifenet Health*, No. 15-6701 (CCC), 2016 WL 544489, at *3, *5 (D.N.J. Feb. 9, 2016), *aff'd*, 2016 WL 3545752 (D.N.J. June 28, 2016).  Here, GAF has identified multiple non-party witnesses likely to have relevant information who are based in the transferee forum, and/or who are beyond the subpoena power of this Court:  Amanda Marchetti, Nearmap's product manager Tony Agresta, Nearmap's VP of Sales for North America, John Ford, a strategic account executive and GAF's principal point of contact at Nearmap on QuickMeasure-related issues; Robert Newman, Nearmap's Chief Executive Officer; Tom Celinski, Nearmap's Chief Technology Officer; Stephen Neale, Nearmap's Product Manager; and Mary Cudmore, who is involved in Nearmap's analytics relating to QuickMeasure.  (Laddha Decl. at ¶ 15.)  When there are "critical witnesses" who are located in the transferee forum and who otherwise may not be compelled to testify at trial, that fact "supports transferring" the case. *COA Network, Inc. v. J2 Global Commcn's, Inc.*, No. 09–6505 (WJM), 2010 WL 2539692, at *4 (D.N.J. June 17, 2010) (noting that one of the named inventors and two attorneys involved in prosecution of the patent-at-issue were located in the transferee forum in California).

In its pre-motion response, Eagleview cites *Gaetano v. Gilead Scis., Inc.*, No. 21-01418 (KM) (JBC), 2021 WL 3185822 (D.N.J. July 27, 2021) for the proposition that GAF must demonstrate that third-party witnesses would be unwilling to come to New Jersey.  (Dkt. No. 27 at 3.)  *Gaetano* is distinguishable from the facts here.  The only non-party witnesses that either side identified in *Gaetano* were the plaintiff's physicians and the defendant's former employees. While the "medical providers should be expected to appear wherever the case is heard," the

former employees had "already sat for depositions, so there is no reason to think they will be uncooperative." *Gaetano*, 2021 WL 3185822 at *3. Here, there are no former employees at issue who "already sat for depositions" who are likely to be witnesses; and the third-party witnesses identified by Mr. Laddha do not appear to have been deposed in any matters relating to the QuickMeasure technology, and were never employed directly by either litigant here.

Moreover, the District of Utah appears to be much closer to where key Eagleview witnesses are located—including those who testified during the *Xactware* Action. For instance, Rishi Daga, who was Eagleview's CEO at the time of the *Xactware* Action, testified that he was based in Seattle, Washington. (Transcript of Jury Trial at 706:11, *Eagle View Techs., Inc. v. Xactware Sols., Inc.*, No. 1:15-cv-07025 (D.N.J. Sept. 11, 2019), Dkt. No. 805 at 112.) Seattle is 832 miles from the District of Utah, but more than 2,800 miles from this District. Matthew Quilter, Eagleview's former CFO—who also gave testimony via deposition on Eagleview's behalf at the *Xactware* trial—also appears to be based in Seattle. In addition, Chris Pershing, a named inventor on several of the Patents-in-Suit and former Eagleview CEO and CTO, testified that he is based in Oro Valley, Arizona, which is roughly 768 miles from the District of Utah. (Transcript of Jury Trial at 473:21-22, *Eagle View Techs., Inc. v. Xactware Sols., Inc.*, No. 1:15-cv-07025 (D.N.J. Sept. 10, 2019), Dkt. No. 804 at 8.) By contrast, Oro Valley is more than 2,300 miles away from this District.

### (f)    The Location of Books and Records.

Much of the key evidence relating to the QuickMeasure Software and its use in generating QuickMeasure reports likely lies outside of this District, and would likely need to be produced pursuant to third-party subpoenas. (*See* Laddha Decl. at ¶ 6-9.) Although that is certainly possible, it would likely be more difficult in this District than in the District of Utah,

where Nearmap is located and already facing a patent infringement suit filed by Plaintiffs on six of the same patents.  At a minimum, this factor is neutral.

        2.      <u>The Public Interest Factors Favor Transfer to the District of Utah.</u>

        **(a)**    **The enforceability of the judgment.**

In a patent infringement case, a judgment from either forum would be equally enforceable.  *See, e.g.*, *Teva*, 2017 WL 2269979, at *8.  However, as this Court has recognized, "Plaintiff can more easily enforce a judgment . . . in the same forum where the infringing product's 'development, testing, research, and production occurred.'"  *Internal Combustion Sols.*, 2014 WL 1391178, at *5 (citation omitted).  GAF's understanding is that while at least some of the foregoing activities have been conducted (and currently are conducted) in the District of Utah, none of those activities has ever been performed in New Jersey.  This factor thus weighs in favor of transfer.

        **(b)**    **Practical considerations that could make the trial easy, expeditious, or inexpensive.**

This factor weighs heavily in favor of transfer.  When assessing this second public interest factor, "the Court may properly consider whether there is a related case which has been first filed or otherwise is the more appropriate vehicle to litigate the issues between the parties."  *Medidata Sols., Inc. v. Datatrak Int'l, Inc.*, No. 12-4748 (WJM), 2013 WL 1989854, at *5 (D.N.J. May 13, 2013).  Plaintiffs filed the Utah Action, which is a related case involving six of the Patents-in-Suit, on the same day that they filed this action.  And the Utah Action is pending against Nearmap, a Utah-based entity that uses QuickMeasure Software as part of the process of producing QuickMeasure reports.  The Utah Action thus overlaps with this case not just in terms of the patents, but also with respect to the entities that are involved with the accused products.  It

is likewise at the same procedural posture as this case. As such, transfer in this case would serve the interests of justice in at least two ways.

*First*, it would avoid "'wastefulness of time, energy, and money that [section] 1404(a) was designed to prevent.'" *COA Network, Inc.*, 2010 WL 2539692, at \*5 (quoting *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960)). There is no reason for two courts to be simultaneously considering discovery issues, reviewing *Markman* briefing on the same patents, and holding multiple trials on the same patents, which would be the case absent transfer to Utah. This Court has therefore emphasized that "the pendency of a related or similar case in another forum is ***a powerful reason*** to grant a motion for change of venue." *Canon Fin. Servs., Inc. v. JL Barrett Corp.*, No. 10-4117 (RMB/KMW), 2010 WL 4746242, at \*3 (D.N.J. Nov. 16, 2010) (emphasis added). Indeed, as this Court previously recognized in connection with transferring a case to a forum where a related action was pending, "[i]t is difficult to imagine a more 'extravagantly wasteful and useless duplication of time and effort' than for multiple suits involving the same product [and patent], instituted within only the past several months, to proceed in different districts." *Teva*, 2017 WL 2269979, at \*9 (alteration in original).

*Second*, it would "eliminate[] [the] possibility of inconsistent results," which is a particularly "compelling consideration . . . regarding the uniform construction of patent claims." *COA Network, Inc.*, 2010 WL 2539692, at \*5. No court has ever issued a *Markman* order construing most of the Patents-in-Suit, and both this Court and the District of Utah will likely be simultaneously considering the proper constructions for the claims of six of those patents. *See, e.g.*, *Medidata*, 2013 WL 1989854 at \*6 (noting that "the Court's failure to transfer the present matter [would create] the very real possibility that two courts will construe the same, or essentially similar, claim terms in the related" patents in those two actions); *Avaya v. Mitel*

21

*Networks Corp.*, 460 F. Supp. 2d 690, 692 (E.D. Va. 2006) (noting that "the prospect of having two or more courts construe the same, or essentially similar, claim terms in the same or related patents may well warrant transfer").

Under such circumstances, this Court has repeatedly held that transfer is appropriate. *See COA Network, Inc.*, 2010 WL 2539692, at *5 (granting motion to transfer to the Central District of California where other infringement cases involving overlapping patents were pending against several third-parties); *Reckitt Benckiser Pharms., Inc. v. Biodelivery Scis. Int'l, Inc.*, No. 14-5892 (MAS) (TJB), 2015 WL 4461511, at *6 (D.N.J. July 21, 2015) (granting motion to transfer to the Eastern District of North Carolina where that case related to "the same product at issue in [that] case, involve[d] nearly the same parties, and it may involve similar testimony," even though the "two different patents [were] at issue in this district and in the [transferee forum]"); *Medidata*, 2013 WL 1989854, at *6-7 (granting motion to transfer to the Northern District of Ohio, where an infringement action involving a related patent was pending, because it "involve[d] the same parties, similar technologies, and a common field of prior art").

To be sure, this Court is also familiar with some of the issues that will be presented by this lawsuit, having invested resources in the *Xactware* trial and the post-trial motions. That fact would at first blush appear to weigh against transfer. But there are several reasons why, despite the Court's experience in *Xactware*, the District of Utah is a more appropriate forum for this matter. <u>*First*</u>, the *Xactware* trial concerned only three of the Patents-in-Suit, while six of the Patents-in-Suit are being simultaneously asserted by Plaintiffs in the District of Utah. <u>*Second*</u>, the '880 Patent is in a different patent family from all of the patents that were asserted at the *Xactware* trial, and has a different inventor, different assignee, and different subject matter from any of the patents that the Court considered at the *Xactware* trial. <u>*Third*</u>, Utah-based Nearmap is

22

directly involved in the infringement allegations that Plaintiffs have made against GAF, unlike the parties and products in the *Xactware* case, which have no relation to GAF or the products or methods in the Patents-in-Suit. *Fourth*, the *Xactware* Action is at a radically different procedural posture than this action and the Utah Action. While the *Xactware* Action is post-trial and on appeal, both this action and the Utah Action are in the earliest stages, with both cases having been filed on May 4, 2021—roughly five years after the original complaint in the *Xactware* Action. Thus, while there are likely to be efficiency gains from the Court's familiarity with some of the Patents-in-Suit, there will still be duplicative litigation if this case were not transferred—in stark contrast to the situation with the *Xactware* Action, which appears to have been the only patent case involving Plaintiffs that was pending at the time that it went to trial. Rather than start from scratch on a new case involving never-before-asserted patents at the same time that the District of Utah is considering these same patents and the same general technology, and duplicate efforts that the District of Utah will need to undertake in any event, this Court should transfer this case to where a related case at roughly the same procedural posture is pending.

### (c) The relative administrative difficulty in the two fora resulting from court congestion.

This factor weighs in favor of transfer. The District of New Jersey has faced a judicial emergency for years based on a lack of judges, and the issues resulting from this long-standing shortage has only been exacerbated by the COVID-19 pandemic.[8] For instance, in the 12-month

---

[8] Until several very recent appointments in 2021, no judge had been confirmed to the District of New Jersey bench since 2016. *See, e.g.*, Tracey Tully, N.Y. Times, *Judges Juggle Over 2,700 Cases Each as Families Wait for Day in Court* (Mar. 17, 2021), https://www.nytimes.com/2021/03/17/nyregion/federal-court-nj-judges.html. Even with those appointments, there are still four vacancies in this District, with two of those in the Camden Vicinage.

*(cont'd)*

period ending March 31, 2021, the District of New Jersey saw a 33% increase in cases, with 1,542 new civil cases per judge.[9]  By contrast, during that same period, the District of Utah had a full complement of judges, with no vacancies, and just 244 civil filings per judge.[10]

> **(d)     The local interest in having localized interests decided at home.**

This factor weighs in favor of transfer.  Patent infringement suits are generally regarded as "matters of national concern that are not 'local controversies,'" but "significant connections between a particular venue and the events that gave rise to a suit . . . should be weighed in that venue's favor."  *ML Design Grp., LLC*, 2013 WL 3049174, at *4 (citations omitted) (alteration in original); *see also Reckitt Benckiser Pharms., Inc.,* 2015 WL 4461511, at *6 (granting transfer motion in part because "this jurisdiction's local interests are outweighed by the EDNC's because the EDNC's interests arise from the development and production of the allegedly infringing product").  As noted above, the District of Utah has significant connections to the operative events that gave rise to this suit.  By contrast, the only connection between this Vicinage and the issues in this suit is the fact that the *Xactware* Action—involving different defendants and accused products—was filed here.

> **(e)     The public policies of the fora.**

This factor is neutral, as the District of Utah generally does not advance any particular public policies relating to patent infringement cases not advanced by the District of New Jersey.  However, as explained above, a *national* policy favoring the uniform construction of patent claims favors transfer to prevent the likelihood of inconsistent judgments.  *See COA Network*,

---

[9]   *See Federal Court Management Statistics*, United States Courts, https://www.uscourts.gov/statistics-reports/federal-court-management-statistics-march-2021 (last updated Mar. 31, 2021).

[10]   *See id.*

2010 WL 2539692, at *5 (granting motion to transfer in part because "holding dueling claim construction hearings in separate fora on the same patents risks inconsistent results").

(f)   **The familiarity of the trial judge with the applicable law.**

This factor is also neutral.  In a patent infringement case, federal judges are presumed to be equally familiar with the relevant law.  *In re TS Tech USA Corp.*, 551 F.3d 1315, 1320 (Fed. Cir. 2008) ("'[P]atent claims are governed by federal law,' and as such 'both [courts are] capable of applying patent law to infringement claims.'") (alterations in original) (citation omitted).

### III.   CONCLUSION

On the same day, Plaintiffs filed two patent infringement suits—both of which implicate Utah-based Nearmap—involving six of the same patents.  Rather than require two courts to duplicate effort in managing all of the discovery issues, holding duplicate *Markman* hearings, and holding duplicate trials, and rather than require witnesses to testify in multiple actions, the far more convenient and efficient approach would be to transfer this case to the District of Utah, which has a more direct connection to the operative facts relating to the infringement allegations in any event.  While the Court is no doubt familiar with many of the issues at play here, all of the *Jumara* factors either weigh in favor of transfer to the District of Utah, or are neutral.  For all of the foregoing reasons, GAF respectfully requests that its motion to transfer be granted.

DATED:  August 25, 2021                    s/Maureen T. Coghlan

                                           Maureen Coghlan
John M. Neukom (*pro hac vice* pending)    Archer & Greiner, P.C.
Skadden, Arps, Slate,                      One Centennial Square
Meagher & Flom LLP                         33 East Euclid Avenue
525 University Avenue                       Haddonfield, NJ 08033
Palo Alto, CA 94301
Tel: (650) 470-4500
john.neukom@skadden.com                    *Attorneys for GAF Materials, LLC*

Edward L. Tulin (*pro hac vice* pending)
Rachel R. Blitzer (*pro hac vice* pending)
Leslie A. Demers (*pro hac vice* pending)
Skadden, Arps, Slate,
Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
edward.tulin@skadden.com
rachel.blitzer@skadden.com
leslie.demers@skadden.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2021, I caused a true and correct copy of the foregoing brief and all exhibits referenced therein to be served by ECF and email upon counsel of record listed below:

Hector Daniel Ruiz
Liza W. Walsh
Walsh Pizzi O'Reilly Falanga LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NY 07102
Tel: 973-757-1100
hruiz@walsh.law
lwalsh@walsh.law

Adam R. Alper
Brandon H. Brown
Natalie Flechsig
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
(415) 439-1400

Gianni Cutri
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Michael W. De Vries
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
(213) 680-8400

Leslie Schmidt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Dated:  August 25, 2021

s/Maureen T. Coghlan
_____

221898980v1