

**Maureen T. Coghlan**
*Member of New Jersey and Pennsylvania Bar*
mcoghlan@archerlaw.com
856-354-3034 Direct
856-795-0574 Direct Fax

Archer & Greiner, P.C.
1025 Laurel Oak Road
Voorhees, NJ 08043
856-795-2121 Main
856-795-0574  Fax
www.archerlaw.com

February 4, 2022

Honorable Renée Marie Bumb, U.S.D.J.
Mitchell H. Cohen U.S. Courthouse
1 John F. Gerry Plaza
 Camden, NJ 08101

   Re: *Eagle View Technologies, Inc. v. GAF Materials, LLC,* No. 1:21-cv-10669

Dear Judge Bumb:

  Defendant GAF Materials, LLC ("GAF") respectfully submits this letter to further address GAF's Motions to Dismiss [ECF No. 31] and Transfer [ECF No. 32].

  **Motion to Transfer**.  Plaintiffs contend that GAF faces a "heavy burden."  (*See, e.g.*, Tr. at 38:5.)  That is not quite right: "Although the burden is on the defendant to establish that transfer is warranted, the defendant is not required to show 'truly compelling circumstances for... change... [of venue, but rather that] all relevant things considered, the case would be better off transferred to another district.'"  *Eon-Net, L.P. v. Drugstore.com, Inc.*, No. CV 05-845 (JCL), 2005 WL 8175900, at *2 (D.N.J. Dec. 20, 2005) (alteration in original) (quoting *In re United States*, 273 F.3d 380, 388 (3d Cir. 2001)).  This case would be better off transferred to Utah, where Plaintiffs chose to file the Nearmap Action on the same day as this suit.  Indeed, Plaintiffs cite no instance when this Court has denied a motion to transfer when (i) plaintiff sued outside its home forum (as Plaintiffs did here); and (ii) there was a pending infringement suit involving overlapping patents in the transferee forum (as is the case here).

  *No Disagreement As to Key Facts Relating to Center of Gravity.*  The Court posed a critical question during oral argument: Do Plaintiffs disagree with how GAF has characterized the facts on slide 18 of GAF's PPT presentation? (Tr. at 24:4-14.)  On that slide, GAF identified three QM-related activities that occur in New Jersey (marketing, sales, orders), and noted that Mr. Laddha and his team are based in New Jersey.  GAF then identified a litany of activities (including QM sales, and the research, development, testing, and production of the software that generates QM reports), witnesses (from Nearmap, Pushpin, EV, and Pictometry), and principal places of businesses (for all relevant entities other than GAF), that are outside of New Jersey.  Plaintiffs did not disagree with how GAF characterized those facts.  Instead, Plaintiffs argued that unless GAF specifically shows that Utah is the center of gravity, this *Jumara* factor does not weigh in favor of transfer.  (Tr. at 40:19-41:25.)  That is incorrect.  *See, e.g.*, *Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*, 797 F. Supp. 2d 472, 481 (D. Del. 2011) (concluding that this factor "weighs in favor of transfer" even where the evidence relating to

"research and development" was "contested" and where much R&D appeared to have occurred outside of the transferee forum); *Liggett Grp. Inc. v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518, 532 (D.N.J. 2000) (granting a motion to transfer in part because the movant "established that the operative facts for this litigation *are not centered in New Jersey*") (emphasis added).

*Mr. Laddha's Interviews That Plaintiffs Cite Are Consistent With His Declaration And GAF's Motion.*  At oral argument, Plaintiffs cited two interviews of Mr. Laddha.  The first confirms *Nearmap's* connection to the operative facts.  (Pl. PPT at Slide 5.)  Mr. Laddha was interviewed by Nearmap's Director of Global Product Marketing during a Nearmap customer event (Nearmap NAVIG8 2020), in a video from the Nearmap website with the Nearmap logo in the upper right-hand corner, in which Mr. Laddha emphasized that QuickMeasure ("QM") has been enabled by "Nearmap's frequent captures, its focus on innovation, and forward-thinking mentality," and highlighted GAF's "relationship with Nearmap." (https://www.nearmap.com/us/en/navig8-2020, "Enabling Roofers with QuickMeasure," at 2:48-2:56, 3:19-3:21.)  The second is from an unidentified interviewer (not Mr. Laddha), who stated that Mr. Laddha had been a "big part of the marketing" associated with QM.  (Pl. PPT at Slide 6.)  As noted in Mr. Laddha's declaration, GAF is directly involved in "*marketing efforts*, commercial relationships, and website design" for QM.  (Laddha Decl., ¶ 11 (emphasis added).)

<u>Motion to Dismiss</u>.  The heart of Plaintiffs' opposition is that this Court should adopt its prior reasoning from *Xactware*.  But GAF's motion concerns new and distinct patents (including the Pictometry '880 patent), new and distinct distillations of the claimed subject-matter (summarized on GAF's Slide 80 and analyzed on Slides 18, 34, 49-50, 59, and 71), and new and distinct caselaw, which compels the conclusion that all asserted claims are unpatentable.

*The '880 Patent is Abstract, and Lacks an Inventive Concept.*  Plaintiffs' January 21 presentation confirms that the '880 patent claims are unpatentably abstract in two respects.  <u>First</u>, Plaintiffs contend that the '880 patent was designed to "address[] a problem . . . with the EagleView ["EV"] computer system."  (Tr. at 120.)  But the '880 patent never claims to be an improvement "on the [EV] computer system"; EV is not even mentioned in its written description or claims, and there is no evidence that Pictometry even had access to the "EV computer system" as of 2009—nearly a half-decade before the EV-Pictometry merger—when the written description of the '880 patent was filed.  The '880 patent is directed to a problem that arises whenever consumers are dealing with addresses—trying to make sure the right location has been designated.  ('880 patent at 10:25-29)  This issue is familiar to anyone who has ever received mail that was intended for a neighbor; and attempting to remedy the issue through an "iterative interface" (i.e., a mouse and keyboard), as claimed in the '880 patent, is unpatentable.

<u>Second</u>, Plaintiffs attempted to defend the Pictometry '880 patent's eligibility by importing limitations from the unrelated EV patents. For example, Plaintiffs argued that the '880 patent should be read to "use these two different types of images, oblique and top-down, do correlation, create a three-dimensional model." (Tr. at 119.)  But the '880 patent claims none of that, and a court cannot retrospectively rewrite the '880 patent to include elements that do not appear.  Indeed, Plaintiffs doubled-down on this inaccurate characterization on Slide 9 of their presentation, claiming that the '880 patent includes "different image types" and a "pitch determination/visual marker."  But the '880 patent does not produce a 3D model from different

Honorable Renée Marie Bumb, U.S.D.J.
February 4, 2022
Page 3

image *inputs* (as in the EV patents); the '880 patent merely *presents* two different image types. The '880 patent also does not include a pitch determination marker—the "visual marker" referenced in the '880 patent is just a generic "shape, pointer, label, icon, avatar or other indicator which is movable or displayable on a computer screen" ('880 patent at 5:9-13). Thus, while Plaintiffs are correct that certain graphical user interfaces may be patentable (Tr. at 117:14-17), '880 patent interface—which merely enables the "iterative" act of using a mouse to move a pin if it is in the spot that is different from the address a user typed in—is not.

***The Mismatch Between the Claimed Subject-Matter and The Prior Opinions on Which Plaintiffs Rely***. Plaintiffs rely heavily on the prior opinions of this Court. But as in *Yu*, there is a "mismatch" between the subject-matter previously addressed by this Court and the subject-matter claimed in at least the patents that were not asserted at the *Xactware* trial. For instance, Plaintiffs cited Judge Kugler's conclusion that "the invention ***recited in the relevant claims*** includes at a minimum the ***creation of a roof model*** primarily through the ***correlation of data points*** shown on ***two different, non-stereoscopic aerial views***." (Pl. PPT at 6 (emphasis added).) The '880 patent claims do not include any of those limitations—i.e., they are not directed to "creation of a roof model," "correlation of data points," or the use of "non-stereoscopic aerial views"—as Plaintiffs effectively conceded on Slide 9 of their January 21 presentation. Similarly, the Court's *Xactware* JMOL opinion emphasized that its Section 101 decision was driven by the claimed requirement of "correlate[ing] these specific images, i.e., non-stereoscopic images." (Pl. PPT at 5.) But the '880, '840, '376, and '149 patents do ***not*** require the use of "non-stereoscopic aerial images," and thus the Court's opinions do not address nearly half of the asserted patents.

***McRO*** ***Confirms That the Asserted Claims Are Abstract.*** During oral argument, both sides devoted considerable time to *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016). *McRO* supports GAF's motion to dismiss for three reasons. <u>First</u>, *McRO* concerned a technology that was rooted exclusively in computers—i.e., "a specific asserted improvement in ***computer animation***," which related to synchronizing animated lips and facial expressions with audio. *Id.* at 1314 (emphasis added). Here, the alleged improvement is not a new way of performing computer animation; it uses computers to replicate the manual process of ordering a roof report (in the case of the '880 patent) or the manual process of using photographs to calculate the dimensions of a roof (in the case of the other asserted patents). <u>Second</u>, the claimed process in *McRO* was fundamentally different from what a human could do—i.e., "an animator's process was driven by ***subjective determinations*** rather than specific, limited mathematical rules." *Id.* (emphasis added). Here, there is no subjective/objective dichotomy like there was in *McRO*; the same mathematical determinations underlie both methods of using photogrammetric equations to calculate roof dimension—whether manually or on a computer. <u>Third</u>, the specified rules in *McRO* outlined the exact method for performing the synchronization process: "evaluate sub-sequences, generate transition parameters [and] apply transition parameters to create a final morph weigh set." By contrast, the claims here are defined strictly in terms of an outcome. For instance, the '436 patent claims the generation of a 3D roof model from two non-stereoscopic images, but includes no rules, algorithms, or equations to perform that step. Similarly, the '376 patent requires pitch determination, but includes no rules, algorithms, or equations to do so. While the claims of *McRO* directly answered the question of "how" to achieve the desired lip synchronization output, the "how" question here is unanswered.

Honorable Renée Marie Bumb, U.S.D.J.
February 4, 2022
Page 4

                                        Respectfully submitted,

                                        */s/ Maureen T. Coghlan*

                                        Maureen T. Coghlan

cc        All Counsel of Record via ECF

MTC:
223404720v1