Samuel C. Straight
Ray Quinney & Nebeker P.C.
36 South State Street, Ste. 1400
Salt Lake City, UT 84111
Tel.: 801-323-3390
Fax: 801-532-7543
sstraight@rqn.com

*Attorney for Defendant - Additional counsel listed in signature*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **EAGLE VIEW TECHNOLOGIES, INC., and PICTOMETRY INTERNATIONAL CORP.,** <br>      ***Plaintiffs,*** <br> **v.** <br><br><br> **GAF MATERIALS, LLC,** <br>     ***Defendant.*** | **MOTION TO DISMISS PURSUANT TO 35 U.S.C. § 101** <br><br><br> Case No.: 2:22-cv-00215 <br><br> Magistrate Judge Jared C. Bennett |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

TABLE OF ABBREVIATIONS ............................................................................. vi

I.      RELIEF SOUGHT AND GROUNDS FOR MOTION ...................................1

II.     THE CLAIMS OF THE PATENTS-IN-SUIT ...............................................2

        A.      "Automated Image Retrieval" Claims – '880 Patent...............................3

        B.      "Model Generation" Claims – '436 Patent ..............................................5

        C.      "Feature Indication/Model Modification + Image Display/Registration"
                Claims – '152 Patent ...............................................................................5

        D.      "Pitch Indication/Model Modification" Claims – '840 and '149 Patents ................6

        E.      "Pitch Determination" Claims – '376, '961, '568, and '960 Patents ........6

        F.      The *Xactware* Action ...............................................................................7

III.    LEGAL STANDARDS ....................................................................................7

        A.      Legal Standard Under Federal Rule of Civil Procedure 12(b)(6)...........7

        B.      Legal Standard for Patent Eligibility Under 35 U.S.C. § 101.................8

IV.     THE PATENTS-IN-SUIT CLAIM UNPATENTABLE SUBJECT-MATTER ................9

        A.      The Claims of the Patents-in-Suit Fail to Satisfy *Alice* Step 1 .................9

                1.      The Claims of the Patents-in-Suit Are Directed to Abstract Ideas .............9

                2.      The Claims Fail Multiple Tests Relating to *Alice* Step 1...........................14

                        (a)     The Claims Are Not Directed to Improved Computer
                                Functionality, but Instead Use Computers Only as a Tool ...........14

                        (b)     The Claims Fail the Pen-and-Paper Test .......................................18

                        (c)     The Claims Are Directed to a Desired Outcome ...........................20

                        (d)     The Claims Are Directed Merely to Data Manipulation ..............21

B.    The Claims of the Patents-in-Suit Fail Step 2 of the *Alice* Test ............................22

    1.    Evidence of Non-Obviousness or Novelty Is Irrelevant to *Alice* Step 2 .........................................................................................................23

    2.    The *Xactware* Decisions and Related Arguments .....................................24

V.    CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
   838 F.3d 1266 (Fed. Cir. 2016)...................................................................................9

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
   573 U.S. 208 (2014) ...................................................................................... *passim*

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC*,
   967 F.3d 1285 (Fed. Cir. 2020)..................................................................................20

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
   927 F.3d 1306 (Fed. Cir. 2019)....................................................................................8

*CyberSource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011)..................................................................................18

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327  (Fed. Cir. 2016)............................................................................11, 14

*FairWarning IP, LLC v. Iatric Systems, Inc.*,
   839 F.3d 1089 (Fed. Cir. 2016)..................................................................................14

*Gabara v. Facebook, Inc.*,
   484 F. Supp. 3d 118 (S.D.N.Y. 2020), *aff'd*, 852 F. App'x 541 (Fed. Cir. 2021)..............20

*In re Gale*,
   No. 2020-2270, 2021 WL 1978973 (Fed. Cir. May 18, 2021) ..........................................22

*GFF Corp. v. Associated Wholesale Grocers, Inc.*,
   130 F.3d 1381 (10th Cir. 1997) ....................................................................................8

*Intellectual Ventures I LLC v. Symantec Corp.*,
   838 F.3d 1307 (Fed. Cir. 2016)..................................................................................14

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
   837 F.3d 1299 (Fed. Cir. 2016)...............................................................................1, 13

*NantWorks, LLC v. Niantic, Inc.*,
   No. 20-cv-06262-LB, 2021 WL 24850 (N.D. Cal. Jan. 4, 2021) ................................14, 15

*Procon Analytics, LLC v. Spireon, Inc.*,
    No. 3:19-cv-201, 2021 WL 1269081 (E.D. Tenn. Apr. 6, 2021) .........................15, 16, 20

*PTP OneClick, LLC v. Avalara, Inc.*,
    413 F. Supp. 3d 1050 (W.D. Wash. 2019).........................................................................18

*RDPA, LLC v. Geopath, Inc.*,
    No. 20-cv-3573 (LJL), 2021 WL 2440700 (S.D.N.Y. June 15, 2021) .............................22

*Realtime Data LLC v. Array Networks Inc.*,
    No. 17-0800-CFC, 2021 WL 1752045 (D. Del. May 4, 2021)..............................15, 16, 23

*RecogniCorp, LLC v. Nintendo Co.*,
    855 F.3d 1322 (Fed. Cir. 2017)........................................................................................21

*RingCentral, Inc. v. Dialpad, Inc.*,
    372 F. Supp. 3d 988 (N.D. Cal. 2019) ..................................................................12, 13, 19

*SAP America, Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018)........................................................................................21

*Secured Mail Solutions LLC v. Universal Wilde*,
    873 F.3d 905 (Fed. Cir. 2017)............................................................................................8

*Simio LLC v. Flexsim Software Products, Inc.*,
    983 F.3d 1353 (Fed. Cir. 2020)...........................................................................16, 23, 25

*SynKloud Technologies, LLC v. HP Inc.*,
    490 F. Supp. 3d 806 (D. Del. 2020)..........................................................................10, 21

*Synopsys Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016).................................................................................12, 23

*Teradata US, Inc. v. SAP SE*,
    No. 20-cv-06127-WHO, 2021 WL 326930 (N.D. Cal. Feb. 1, 2021) ..............................25

*Two-Way Media Ltd. v. Comcast Cable Communications, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017)........................................................................................23

*University of Florida Research Foundation, Inc. v. General Electric, Co.*,
    916 F.3d 1363 (Fed. Cir. 2019)................................................................................... 18-19

*WhitServe LLC v. Dropbox, Inc.*,
    854 F. App'x 367 (Fed. Cir. 2021) ..................................................................................23

*Yu v. Apple Inc.*,
  1 F.4th 1040 (Fed. Cir. 2021) ................................................................... *passim*

## STATUTES & RULES

35 U.S.C. § 101 .................................................................................................... *passim*

## TABLE OF ABBREVIATIONS[1]

| Abbreviation | Definition |
|---|---|
| "'436 patent" | U.S. Patent No. 8,078,436 |
| "'840 patent" | U.S. Patent No. 8,170,840 |
| "'152 patent" | U.S. Patent No. 8,209,152 |
| "'880 patent" | U.S. Patent No. 8,542,880 |
| "'961 patent" | U.S. Patent No. 8,670,961 |
| "'376 patent" | U.S. Patent No. 9,129,376 |
| "'568 patent" | U.S. Patent No. 9,514,568 |
| "'960 patent" | U.S. Patent No. 10,528,960 |
| "'149 patent" | U.S. Patent No. 10,685,149 |
| "Defendant" or "GAF" | GAF Materials, LLC |
| "FAC" | First Amended Complaint (Dkt. No. 11) |
| "Patents-in-Suit" | United States Patent Nos. 8,078,436; 8,170,840; 8,209,152; 8,542,880; 8,670,961; 9,129,376; 9,514,568; 10,528,960; and 10,685,149 |
| "Eagleview" | Eagle View Technologies, Inc. |
| "Pictometry" | Pictometry International Corporation |
| "Plaintiffs" | Eagle View Technologies, Inc. and Pictometry International Corporation, collectively |
| "*Nearmap* Action" | *Eagle View Technologies, Inc. et al. v. Nearmap US, Inc.*, No. 2:21-cv-283-TS-DAO (D. Utah compl. filed May 4, 2021) |
| "*Nearmap* Decision" | *Eagle View Technologies Inc. v. Nearmap US, Inc.*, Case No. 2:21-cv-283-TS-DAO, 2021 WL 5299729 (D. Utah Nov. 15, 2021) |
| "*Xactware* Action" | *EagleView Technologies, Inc. v. Xactware Solutions, Inc.*, No. 1:15-cv-07025-RMB-JS (D.N.J. compl. filed Sept. 23, 2015) |
| "*Xactware* Defendants" | Xactware Solutions, Inc. and Verisk Analytics, Inc., collectively |

---

[1]   Unless otherwise noted, all emphases herein have been added and all internal caselaw citations have been omitted.

## I.    RELIEF SOUGHT AND GROUNDS FOR MOTION

The nine Patents-in-Suit asserted by Plaintiffs against GAF claim an array of abstract ideas relating to computer-based data input, generation, and reporting, and include precisely the sort of claims that have been held invalid under 35 U.S.C. § 101.  Plaintiffs therefore have failed to state a plausible claim for infringement, and the FAC should be dismissed.

GAF is mindful that the *Nearmap* Decision addresses one of the Patents-in-Suit, and that three Patents-in-Suit were asserted at trial in the *Xactware* Action.  But GAF respectfully submits that the particular grounds, arguments, and caselaw presented herein—nearly all of which the Court has not yet had the opportunity to consider—compel dismissal of the FAC:

- While the *Nearmap* Decision noted that Nearmap "has not convinced the Court" that the '152 patent is directed to an abstract idea, the Court has not considered the patentability of any of the other eight Patents-in-Suit, or had the chance to consider the patentability '152 patent in the context of the other Patents-in-Suit.  Moreover, while the Court noted that Nearmap failed to "meaningfully distinguish" the '152 patent claims from those at issue in *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016), GAF has specifically distinguished *McRO* below.

- The claims that are most analogous to those in the Patents-in-Suit are not the claims in *McRO*, but rather those at issue in *Yu v. Apple Inc.*, 1 F.4th 1040 (Fed. Cir. 2021), which the Federal Circuit held were unpatentable under Section 101.

- In the *Xactware* Action, the New Jersey Court was presented only with the contention that a single, unifying abstract idea was embodied by three of the Patents-in-Suit: using photogrammetry to generate a roof report.  But in fact, the Patents-in-Suit claim a hodgepodge of five abstract ideas: (1) automated image retrieval based on user input ['880 patent]; (2) generation of a 3D building model based on multiple images ['436 patent]; (3) use of user-based input to overlay and register building images ['152 patent]; (4) use of user-based input to modify a 3D building model ['840 and '149 patents]; and (5) calculation of roof pitch in combination with one or more of the foregoing abstract ideas ['376, '961, '568, and '960 patents].

- In the FAC, Plaintiffs attempt to rewrite the asserted claims, contending that they are directed to allegedly non-abstract "correlations of non-stereoscopic images to generate roof reports with accurate information."  (FAC ¶ 26.)  But that description is untethered from nearly all of claims of the Patents-in-Suit, given that only the '436

patent claims the use of images that are not a "stereoscopic pair."  Moreover, none of the claims requires that any particular accuracy threshold be met.  That Plaintiffs resort to such rewriting of the claim language—in contravention of Federal Circuit law—underscores that the claims run afoul of Section 101.

- The asserted claims do not contain any inventive concept because they recite nothing more than conventional computer functions and systems used in entirely conventional ways.  Rather than confronting that indisputable fact, the FAC (i) contends that the claimed technology was lauded as "revolutionary"; and (ii) references the *Xactware* decisions.  Plaintiffs' first contention should be rejected because questions of novelty cannot be conflated with the Section 101 inquiry, and in any event, the FAC does not directly link any laudatory comments to claimed limitations.  Plaintiffs' second contention should be rejected at least because of the limited overlap between the *Xactware* Action and this case, the recent Federal Circuit decisions clarifying that the asserted claims do not include an inventive concept, and because Plaintiffs sought to vacate the very decisions upon which they now rely.

## II.    THE CLAIMS OF THE PATENTS-IN-SUIT

The nine Patents-in-Suit come from multiple patent families.  Four of them have the same sole inventor and title; four others have the same two inventors (and similar titles); while the '880 Patent has different inventors, and is assigned to a different entity from the others.  The Patents-in-Suit generally concern computer-based "roof-estimation technology," (FAC ¶ 26), but are directed to one or more computer-based tasks, including image retrieval, roof feature indication, generation and modification of a 3D model, and calculation of roof pitch.  (*See, e.g.*, *id.*, Ex. 3 at 2:14-20 (characterizing the Patents-in-Suit as directed to "various functions," such as "image registration . . . pitch determination, feature identification, and model review and/or correction").)  Importantly, there is no evidence that Plaintiffs were the earliest provider of remote aerial roof measurement services.  On the contrary, the '880 patent notes that "for ***many years***" prior to 2009, "***companies*** and ***products*** have offered [roof] estimation services and reporting software reports using ***aerial imagery*** on which roof line outlines are traced,

2

dimensions and areas are automatically based on those tracings, and vertical elevations (via **pitch** or otherwise) are included in mathematical models."  ('880 patent at 1:21-26.)

### A.    "Automated Image Retrieval" Claims – '880 Patent

The '880 Patent was filed on February 22, 2013, and issued on September 24, 2013—nearly a year before *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014), the Supreme Court's seminal decision regarding 35 U.S.C. § 101.  The '880 patent is assigned to Plaintiff Pictometry (Plaintiff Eagleview appears to have no right, title, interest in, or license to, the '880 patent).  (FAC ¶ 14; *id.*, Ex. 4.)  The '880 patent was not asserted at the *Xactware* trial.

While the '880 patent is entitled "System and process for roof measurement using aerial imagery," its claims are not directed to roof measurement.  The FAC addresses only claim 1:

> 1. A process for determining attributes of a roof structure of a real-world three-dimensional building, comprising the acts of:
>
> providing at least one computer input field for a user to input first location data generally corresponding to the location of the building;
>
> providing visual access to an aerial image of a region including the roof structure of the building corresponding to said first location data, the aerial image taken from a straight down overhead view with respect to the roof structure;
>
> on the aerial image of the region, providing a visual marker that is moveable on a computer monitor around said region, said visual marker initially corresponding to said first location data, wherein said visual marker may be moved to a final location on top of the building to more precisely identify the location of the building roof structure, the final location having location coordinates;
>
> providing a computer input capable of signaling user-acceptance of the final location of said marker; and,
>
> providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location.

The steps of that claim are generally depicted in the flow chart in Figure 3.  Other than the description of Figure 3, very little of the '880 patent addresses the claimed embodiment.  (*See,*

*e.g.*, FAC, Ex. 4 at 11:24-27 ("In FIG. 3, the location data 4A is entered. Aerial imagery with a

marker is provided 4B. A person moves the marker on the image of the building 4C. User

acceptance of that marker position is then signaled 104b.").)  Those conventional steps are also

illustrated in Figures 4A through 4D, which shows a user entering an address, being presented

with a photograph and marker, moving that marker, and then receiving an oblique image:[1]



Claim 1 of the '880 patent is thus directed to the automated retrieval of an oblique image

(i.e., a photograph that is taken at an angle) from a database based on verified location

---

[1]  An "oblique" image is taken from an angle, as opposed to an image which is taken straight
down from a point directly above a roof.  (*See* FAC, Ex. 4 at 2:54-59; 8:10-14; Fig. 4B.)

information (such as an address).  (FAC ¶¶ 114-119.)  This claim is not directed to a method of correlating images or calculating roof dimensions.  On the contrary, it is written primarily in terms of an end result—i.e., displaying an "oblique" image corresponding to an address.

### B.    "Model Generation" Claims – '436 Patent

The '436 patent is the oldest of the Patents-in-Suit, having issued on December 13, 2011—years before the Supreme Court's *Alice* decision—based on an application that was originally filed on April 17, 2007.  Like many of the other Patents-in-Suit, the '436 patent is entitled "Aerial Roof Estimation Systems and Methods."  The FAC addresses only claim 1, which is essentially directed to a four-step process: (1) receiving at least two non-stereoscopic aerial images; (2) correlating those images; (3) generating a 3D-model based on that correlation; and (4) generating and transmitting a report based on that 3D model.

### C.    "Feature Indication/Model Modification + Image Display/Registration" Claims – '152 Patent

The '152 patent issued on June 26, 2012—nearly two years before the *Alice* decision—and is entitled "Concurrent Display Systems and Methods for Aerial Roof Estimation."  This title bears little resemblance to the language of representative claim 10, which is directed to modifying a 3D model based on a "feature" of a roof that a user inputs into the computer, displaying a projection of that feature, and then registering an image.

According to Plaintiffs, the claims of the '152 patent are directed to:  "receiving an indication" of a building feature, "modifying" a model of that building, and "overlaying 'line drawings' in a user interface."  (FAC ¶ 29.)  In other words, claim 10 of the '152 patent describes a process of presenting the results of collecting and analyzing information using computers as tools.  The '152 patent was not asserted during the *Xactware* trial.

**D.      "Pitch Indication/Model Modification" Claims – '840 and '149 Patents**

The '840 and '149 patents have the same title—"Pitch Determination Systems and

Methods for Aerial Roof Estimation"—but their claims are not actually directed to pitch

***determination***.   Instead, these two asserted claims are directed to pitch ***indication*** by a user

through a computer interface, and then using that indication to modify a 3D model of a pitched

roof (whereas the '152 patent, discussed above, uses generic "feature" indication to modify a 3D

model).  The '840 patent, which issued more than two years before the *Alice* decision, was

asserted during the *Xactware* trial, while the '149 patent was not.

The two claims of the '840 and '149 Patents addressed in the FAC use virtually identical

language to describe a method of displaying an aerial image of a building, indicating the pitch of

a portion of the building's roof, and then modifying a model of that roof.  The principal

differences between these claims are: (i) the means for inputting pitch is called a "pitch

determination marker" in claim 1 of the '840 patent (as opposed to "an interactive user interface

control" in the '149 patent); and (ii) claim 1 of the '149 patent explicitly claims generating a roof

estimate report with certain attributes.  Instead of claiming a method of receiving user input of a

generic "feature" and using that input to modify a roof model (as the '152 patent does), the '840

and '149 patent claims are directed to receiving user input specifically about "pitch," and using

that input to modify a roof model (in an unspecified way, using an unspecified algorithm).

**E.      "Pitch Determination" Claims – '376, '961, '568, and '960 Patents**

The '376 patent is entitled "Pitch Determination Systems and Methods for Aerial Roof

Estimation," while the other three "Pitch Determination" patents are from the same family and

have the same title:  "Aerial Roof Estimation Systems and Methods."

Plaintiffs address claim 1 from each of these patents in the FAC.  Those claims merely mix-and-match the same generic process steps as the above-discussed claims while also reciting a step of roof pitch determination.[2]  The specification never discloses ***how*** to determine the roof pitch; pitch determination is discussed purely in terms of a desired result ("accurately determine the pitch"),[3] rather than in terms of inventive steps (if any) used to achieve the result.

F. **The *Xactware* Action**

The FAC relies heavily on the prior opinions from the *Xactware* Action, which addressed certain claims of three of the Patents-in-Suit (albeit not a single claim asserted in the FAC). (*See, e.g.*, FAC, Ex. 13 (addressing claims 2, 21, and 36 of the '436 patent; claims 10 and 18 of the '840 patent; and claims 17, 20, and 23 of the '376 patent).)  To be sure, there is overlap between the subject-matter of the *Xactware* claims and those asserted here.  But the *Xactware* Defendants argued that "EagleView's Patents fail the first *Alice* step because they disclose nothing more than 'putting a roofer on a roof' with a tape measure which measurements are then inputted into a computer from which a report is generated."  (FAC, Ex. 10 at 18.)  That is markedly different from GAF's characterization of a different set of claims.

III. **LEGAL STANDARDS**

A. **Legal Standard Under Federal Rule of Civil Procedure 12(b)(6)**

Rule 12(b)(6) requires that a complaint be dismissed if it fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When evaluating the sufficiency of a

---

[2]   Certain "Pitch Determination" claims also refer to a calibration step, but the FAC itself clarifies that "calibration" refers to the generic and conventional step of "identifying common reference points depicted" in two roof images.  (FAC ¶ 28.)

[3]   *See, e.g.*, '376 patent at 5:64-6:5; '961 patent at 9:31-39.

complaint under Rule 12(b)(6), the Court accepts all "well-pleaded factual allegations in the complaint as true, but "mere legal conclusions and factual allegations that contradict" documents incorporated by reference into a Complaint "are not well-pleaded facts." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384-85 (10th Cir. 1997). In particular, when considering a motion to dismiss based on Section 101 grounds, "a court need not 'accept as true allegations that contradict matters properly subject to judicial notice or by exhibit,' such as the claims and the patent specification." *Secured Mail Sols. LLC v. Universal Wilde*, 873 F.3d 905, 913 (Fed. Cir. 2017) (citation omitted). As such, allegations about inventiveness that are "wholly divorced from the claims or the specification" cannot defeat such a motion. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019).

### B.    Legal Standard for Patent Eligibility Under 35 U.S.C. § 101

The Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." 35 U.S.C. § 101. However, the Supreme Court has interpreted Section 101 of the Patent Act as "contain[ing] an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (citation omitted). "The 'abstract' ideas category embodies 'the longstanding rule that "[a]n idea of itself is not patentable."'" *Id.* at 218. When considering whether subject matter falls into this category, courts "must distinguish between patents that claim the '"buildin[g] block[s]"' of human ingenuity and those that integrate the building blocks into something more." *Id.* at 217.

The Supreme Court has established a two-part test for determining whether a claim is directed to subject matter that is not eligible for patent protection. *See Alice*, 573 U.S. at 217-18.

In Step 1, the Court asks whether the claims "are directed to a patent-ineligible concept," such as an abstract idea. *Id.* at 218. If the Court answers this question in the affirmative, it then moves to Step 2 and assesses whether the patent claims include an "inventive concept" that can "'transform' the . . . abstract idea into a patent-eligible invention." *Id.* at 221. The *Alice* Court explained that an inventive concept is "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* at 217-18. If a claim is directed to the implementation of an abstract idea using a computer, or to "well-understood, routine, conventional activity," then there is no "inventive concept" sufficient to satisfy *Alice* Step 2. *See id.* at 221, 225-26.

## IV.    THE PATENTS-IN-SUIT CLAIM UNPATENTABLE SUBJECT-MATTER

### A.    The Claims of the Patents-in-Suit Fail to Satisfy *Alice* Step 1

#### 1.    The Claims of the Patents-in-Suit Are Directed to Abstract Ideas

The seven method claims and two system claims in the FAC embody five abstract ideas:[4]

| Abstract Idea | Patent(s) |
|---|---|
| Automated image retrieval | '880 patent |
| 3D model generation | '436 patent |
| Feature indication/model modification & image display/registration | '152 patent |
| Pitch indication and model modification | '840 and '149 patents |
| Pitch determination | '376, 961, '568 & '960 patents |

---

[4]   The FAC addresses only a single claim from each one of the Patents-in-Suit, which indicates that those claims are representative for purposes of this motion. In addition, those claims are representative because (1) the other independent claims of the Patents-in-Suit are substantially similar to those addressed in the FAC, and largely recycle the same subject-matter (for instance, by swapping a "method" claim for a "system" claim), and (2) the dependent claims reflect the same abstract concepts as the independent claims, and the FAC does not contend that any of those dependent claims provides an inventive step. *See, e.g.*, *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1268 n.2 (Fed. Cir. 2016).

Those abstract ideas embody well-known, conventional steps that involve using computers (and/or computer inputs) to generate results (i.e., a report with data about a roof).

In essence, the claims-at-issue are directed to conventional computer systems that either use conventional computer functions to retrieve images based on location data, or use well-known trigonometry equations or photogrammetric algorithms and conventional user input to perform data analysis,[5] the results of which are then presented or displayed in a conventional format.[6] Indeed, this Court has already determined that "gather[ing] and process[ing] information about roofs, overlaying outlines onto images, and registering points on images to three-dimensional grids" are "abstract concepts." *Nearmap*, 2021 WL 5299729, at *4. These are precisely the sort of claims found to be abstract under the most recent caselaw. *See SynKloud Techs., LLC v. HP, Inc.*, No. 19-1360-RGA, 2021 WL 3568371, at *4 (D. Del. Aug. 12, 2021) (granting a Rule 12(c) motion for judgment on the pleadings that patent claims were ineligible under Section 101 and noting that "Federal Circuit precedent is clear: 'Remotely accessing and retrieving user-specified information is an age-old practice that existed well before the advent of computers and the Internet'"); *see also Yu*, 1 F.4th at 1042-43 (affirming Section 101 dismissal of

---

[5] The Patents-in-Suit do not describe any new ways of calculating roof pitch (i.e., "slope") or creating a 3D model. On the contrary, the Patents-in-Suit simply incorporate prior methods of performing those activities. (*See, e.g.*, '436 patent at 5:67-6:3 ("The slope can be easily calculated . . . using basic trigonometry."); *id.* at 7:1-7 (disclosing the creation of a 3D model from algorithms described in "textbooks, trade journals, and academic publications").)

[6] For purposes of this motion, there is no need for the Court to perform claim construction for any of the terms of the Patents-in-Suit, as their abstract and non-inventive nature is self-evident. In the *Xactware* Action, Plaintiffs argued that all claim terms were "readily understandable," and that "no constructions are necessary for the disputed terms." (*Xactware* Action, ECF No. 189 at 2.) To the extent this motion is denied in whole or in part, Defendant reserves the right to offer proposed claim constructions for the Patents-in-Suit.

patent claims directed to the use of multiple photographs to produce an allegedly "new" type of

enhanced image).  And that caselaw is highly relevant to the Step 1 inquiry, which requires

courts to "compare the claims at issue to those claims already found to be directed to an abstract

idea in previous cases."  *Enfish, LLC v. Microsoft Corp.,* 822 F.3d 1327, 1334 (Fed. Cir. 2016).

  *Yu* is the most instructive and analogous case. 1 F.4th at 1042-43.  In *Yu*, the Federal

Circuit held that a claim failed *Alice* Step 1 because it was "directed to the abstract idea of taking

two pictures (which may be at different exposures) and using one picture to enhance the other in

some way."  *Id.*  The *Yu* plaintiffs asserted that by "providing a specific solution" to problems

such as "low resolution caused by low pixel counts" and "inability to show vivid colors caused

by limited pixel depth," their patent claims were not abstract.  *Id*. at 1044.  The *Yu* Court rejected

that argument because the claim offered only a solution that was "the abstract idea itself."  *Id.*

The *Yu* patent claim required digital image inputs that were then used to "produc[e] a resultant

digital image from [a] first digital image enhanced with [a] second digital image," just as the

image inputs here are used to generate a resultant roof report.  *Id.* at 1042.  And while the *Yu*

plaintiffs emphasized that "the asserted advance in the claims is the particular configuration of

lenses and image sensors" that were used to output a new digital image, that was insufficient to

satisfy *Alice* Step 1, in part because there was a "mismatch between" the allegedly non-abstract

elements and the "breadth of [the] claim."  *Id.* at 1044-45.

  The similarities between *Yu* and the claims asserted here are striking and numerous.  Just

as the *Yu* plaintiffs argued that their claims were directed to a technological solution to a specific

problem, so too do Plaintiffs contend that the "Patents-in-Suit solve the specific problem of

generating a roof repair estimate without direct human measurement of a roof using, *inter alia*,

concrete and specific technological solution of a computer's correlating, with or without user input, different location points on two, different, non-stereoscopic aerial views and then generating a roof report including accurate information concerning the real-world roof," which Plaintiffs go so far as to characterize as "the highest echelon of accuracy."  (FAC ¶¶ 26, 31.)  But that allegedly specific solution, even under Plaintiffs' formulation, is just "image correlation" followed by "report generation."  As in *Yu*, those are the abstract ideas themselves.

Moreover, just as there was a "mismatch" between the asserted technological solution in *Yu* and the **_actual claim language_**, so too is there a "mismatch" between the "specific solution" asserted by Plaintiffs here and the actual claim language.  Not one of the claims addressed in the FAC requires any particular accuracy in modeling a roof, and the FAC does not explain how such accuracy is allegedly achieved (or whether such purported accuracy relates to any of the actual claim elements).  Six of the Patents-in-Suit do not include any "image correlation step"— that is claimed only in the '436, '961, and '568 patents.  And most of the Patents-in-Suit are not directed to the use of "non-stereoscopic images"—utilization of such images is explicitly claimed only in the '436 patent.  In other words, even Plaintiffs' description of the "solution" allegedly embodied in the claims is not found in those claims.  It is thus inaccurate for Plaintiffs to contend in the FAC that the asserted claims reflect "EagleView's patented selection of images," (FAC ¶ 27), because most of the asserted claims have nothing to do with a "selection of images," and an unclaimed concept cannot salvage claims from abstraction.  *Cf. Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) (holding that the "§ 101 inquiry must focus on the language of the [a]sserted [c]laims themselves"); *RingCentral, Inc. v. Dialpad, Inc.*, 372 F. Supp. 3d 988, 997 (N.D. Cal. 2019) (rejecting argument that claim was "designed to

work . . . in real-time" as an improvement over prior art because plaintiff was unable to "identify anything in the claim or specification that specifies a 'real-time' or immediate response").

In addition, although the *Nearmap* Decision found that the '152 patent claims are analogous to those that were found to be patentable in *McRO*, that case supports GAF's motion to dismiss for three reasons.  *First*, *McRO* concerned a technology that was rooted exclusively in computers—i.e., "a specific asserted improvement in ***computer animation***," which related to synchronizing animated lips and facial expressions with audio.  837 F.3d at 1314.  Here, the alleged improvement is not a new way of performing computer animation; it uses computers to replicate the manual process of ordering a roof report (in the case of the '880 patent) or the manual process of using photographs to calculate the dimensions of a roof (in the case of the other Patents-in-Suit).  *Second*, the claimed process in *McRO* was fundamentally different from what a human could do—i.e., "an animator's process was driven by ***subjective determinations*** rather than specific, limited mathematical rules."  *Id*.  Here, there is no such subjective/objective dichotomy; the same mathematical determinations underlie both manual and computer-based methods of using trigonometry and photogrammetry to calculate roof dimensions.  *See, e.g.*, *People.ai, Inc. v. SetSail Techs., Inc.*, No. C 20-09148 WHA, 2021 WL 5882069, at *5 (N.D. Cal. Dec. 13, 2021) (distinguishing the claims in *McRO* from those that concerned a "commercial process" with "no artistic, subjective element").  *Third*, the specified rules in *McRO* outlined the exact method for performing the synchronization process:  "evaluate sub-sequences, generate transition parameters [and] apply transition parameters to create a final morph weigh set."  837 F.3d at 1314.  By contrast, the claims here are defined strictly in terms of an outcome.

13

## 2. The Claims Fail Multiple Tests Relating to *Alice* Step 1

The Federal Circuit has endorsed the use of multiple tests as indicia of whether claims are directed to an unpatentable abstract idea at *Alice* Step 1: (1) the "improved computer functionality" test; (2) the "pen-and-paper" test; (3) the "desired outcome" test; and (4) the "mere manipulation of data" test.  The claims of the Patents-in-Suit fail all four of these tests.[7]

### (a) The Claims Are Not Directed to Improved Computer Functionality, but Instead Use Computers Only as a Tool

When evaluating computer-related claims, courts should examine whether the claims "purport to improve the functioning of the computer itself," *Alice*, 573 U.S. at 225, or by contrast whether "computers are invoked merely as a tool" to implement an abstract process.  *Enfish*, 822 F.3d at 1335-36.  Since the *Xactware* trial, multiple decisions have clarified where to draw the line between patentable computer improvements and patent-ineligible use of computers as a tool.

For instance, in *Yu*, the patentees argued that their claims were "directed to a patent-eligible ***improvement in digital camera functionality***" by "providing a specific solution" to problems such as "low resolution caused by low pixel counts" and "inability to show vivid colors caused by limited pixel depth."  *Yu*, 1 F.4th at 1044 (citation omitted).  But the Federal Circuit

---

[7]   In the FAC, Plaintiffs appear to assert that these critical indicia can be discarded because the claims allegedly do not preempt the entire field of "roof measuring."  (FAC ¶ 31; *see also id.* ¶ 27.)  That is incorrect.  *First*, as discussed above, multiple Patents-in-Suit are not directed to "roof measuring," and instead claim generic computer-implemented steps (such as automated image retrieval, feature indication/display, and pitch determination).  Those claims risk appropriating the basic building blocks of conventional computer functions, photogrammetry, and trigonometry.  *Second*, "[w]hile preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility."  *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1321 (Fed. Cir. 2016); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1098 (Fed. Cir. 2016) (noting that even if there was no preemption of a field, the claims were not "any less abstract").

rejected that contention because the claim recited only "conventional camera components," that "perform only their basic functions." *Id.* at 1043; *see also Procon Analytics, LLC v. Spireon, Inc.*, No. 3:19-cv-201, 2021 WL 1269081, at *9 (E.D. Tenn. Apr. 6, 2021) (patent did "not pass muster under step 2 of *Alice*" where "[n]othing in the claims, understood in light of the specification, require[d] anything other than off-the-shelf, conventional computer, network, and display technology gathering, sending, and presenting the desired information"). The Federal Circuit has held that patent-eligible computer functionality improvements must be rooted in a "concern ***unique to computers***," such as "improvements in graphical user interfaces [GUIs]," "new method[s] to construct databases," "new, particularized memory system[s]," or "improvements in computer virus scanning." *Realtime Data LLC v. Array Networks Inc.*, No. 17-0800-CFC, 2021 WL 1752045, at *16 n.4 (D. Del. May 4, 2021). The claims do not address a concern unique to computers (and instead relate to alleged improvements to the generic concept of "roof-estimation technology," which unlike GUIs, database construction, memory hardware, or computer virus resistance, can be operated entirely independently of computers)—nor do they claim any improved hardware or unconventional computer components, nor use computer components in unconventional ways.

For instance, the "Automated Image Retrieval" abstract idea claimed in the '880 patent draws entirely on existing computer functions and architecture for the claimed process, which is nothing more than a set of steps that could be used to order a report for a particular address. That is a quintessential computer-based business method, and is unpatentable under 35 U.S.C. § 101 because it only uses computers as a tool. *See, e.g., NantWorks, LLC v. Niantic, Inc.*, No. 20-cv-06262-LB, 2021 WL 24850, at *6, *8 (N.D. Cal. Jan. 4, 2021) (granting motion to dismiss based

on the well-established precedent that a "transaction based on location is an abstract idea" and represents a "fundamental and longstanding business practice").  The FAC does not even contend that claim 1 of the '880 patent improves computer functionality—nor could it, as this is the sort of foundational process that has been commonly used on computers for decades.  And as noted above, the process of claim 1 of the '880 patent is "captured in a simple flow chart" in Figure 3, which further confirms its "abstract nature."  *Realtime Data*, 2021 WL 1752045, at *8.

For most of the remaining claims, the FAC relies on the wrong comparison.  It does not compare the functionality of computers before and after the implementation of the claimed elements; it instead compares how roof reports were allegedly made before and after the priority date of the Patents-in-Suit.  (*See, e.g.*, FAC ¶ 26.)  But the question under *Alice* Step 1 is not whether the claims may result in allegedly quicker, cheaper, or safer roof estimates than those involving direct human measurement; it is whether a computer functions in a new and different way.  *See Simio LLC v. Flexsim Software Prods., Inc.*, 983 F.3d 1353, 1361 (Fed. Cir. 2020) (noting that "improving a user's experience while using a computer application is not, without more, sufficient to [claim] an improvement in computer functionality"); *see also Realtime Data*, 2021 WL 1752045, at *17 ("Efficiency gains are not the same as a technical solution to a technical problem.")  The FAC is silent on that question because the claims only leverage existing computer capabilities, as in *Yu*, *Realtime Data*, and *Procon*.

For instance, the FAC contends that "the '436 patent teaches improving a computer system by 'receiving' and 'correlating' aerial images and 'generating' 'a three-dimensional model of the roof'" that . . . [is] "subsequently 'transmit[ted].'"  (FAC ¶ 28.)  But those are all inherent functions that could be performed by computers long before the '436 patent was filed.  The

specification of the '436 patent does not identify anything about these "receiving," "correlating," "generating," or "transmitting" steps that a computer could not have done before the claimed invention.  On the contrary, the '436 specification explains that these steps are routine and conventional computer functions.  (*See, e.g.*, Fig. 8; *see also* FAC, Ex. 1 at Fig. 8, 13:52-14:56 (describing the "receiv[ing]" step as a conventional receipt of stored images from a "data repository"; describing the "correlating" step as identifying a "pair of points corresponding to substantially the same point on the roof depicted in each of [two] images"; describing the "generating" step as the generic process of "automatic image processing techniques," none of which is specifically identified); *id.* at 9:51-10:39 (describing the "generating and transmitting" step as a generic process of, for instance, "automatically determining font size, label position, and/or label orientation" for "an electronic file (e.g., a PDF file) or a paper document," and then sending the report "such as via a network (e.g., as an email, Web page, etc.) or by some shipping mechanism, such as the postal service, a courier service, etc.").)  Indeed, the '436 patent clarifies that generating a roof model is not unique; it is based on well-known, prior art algorithms that are "described in . . . textbooks, trade journals, and academic publications."  (FAC, Ex. 1 at 7:1-7.)  That is the definition of using off-the-shelf computers as tools to implement abstract ideas.

The FAC similarly argues that the '376, '568, '960, and '961 patents improve computer functionality through the above steps, as well as additional steps such as "calibrating" and calculating pitch.  In particular, the FAC contends that "convert[ing] a distance in pixels . . . into a physical length" and "identifying common reference points depicted" are processes that improve computer functionality.  (FAC ¶ 28.)  Not so.  Plaintiffs cannot plausibly contend that they invented the ability for a computer to "convert a distance in pixels into a physical length" or

to "identify common reference points," when the Patents-in-Suit are devoid of any description, computer code, or illustration of how a computer would perform those wholly conventional steps using anything other than wholly conventional computer components and well-known equations.

### (b)   The Claims Fail the Pen-and-Paper Test

As another test used to help determine whether a claim is abstract, the Federal Circuit has recognized that conventional "method steps [that] can be performed . . . by a human using a pen and paper" are unpatentable, even if a computer may be required under the claim language. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372-73 (Fed. Cir. 2011); *see also PTP OneClick, LLC v. Avalara, Inc.*, 413 F. Supp. 3d 1050, 1059 (W.D. Wash. 2019) ("The Federal Circuit often uses a 'pencil and paper' test at step one to determine if a human could perform the patented method with a pencil and paper instead of a computer." (collecting cases)). The claims of the Patents-in-Suit fail the pen-and-paper test, and thus fail *Alice* Step 1.

For instance, a person could do all of the steps in claim 1 of the '880 patent, including writing down an address, presenting a physical photograph, marking a desired location in that photograph with a pen or pencil, and then retrieving a final oblique image of the desired location. Similarly, a person could do all of the steps of claim 1 of the '436 patent manually by taking two aerial photographs, identifying common points, applying the well-known, prior art photogrammetric equations referenced in the '436 patent to create a 3D roof model, and then writing a report that includes the numerical values recited in the claim. That a computer could do these steps faster or more efficiently—even in a way that might be considered revolutionary—does make the claimed idea any less abstract. *See, e.g., Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019) ("*UFRF*") (affirming that a

patent directed to the collection, analysis, manipulation, and display of health data was a "quintessential 'do it on a computer' patent," which "seeks to automate 'pen and paper methodologies'").[8]  The '436 specification does not suggest that the well-known algorithms cited therein could not be used to correlate pairs of images (such as non-stereoscopic images), or that the steps in the '436 patent claims could not have been done by a person with photos, a pen, paper, and a knowledge of photogrammetry.

The same is true for the "Pitch Determination" claims.  Their specification does not teach that only computers are capable of performing the claimed determination of roof pitch; a person with a pen and paper and a knowledge of trigonometry is equally capable of doing so.  Similarly, a person could easily "input" a previously observed pitch, or another feature of a roof, into well-known photogrammetric equations and use the resulting pen-and-paper calculations to build a scale 3D model, as architects building models routinely do.  Thus, even if the claimed process could not have been performed mentally (because physical photos or models are involved), those claims all fail the pen-and-paper test.  *See RingCentral*, 372 F. Supp. 3d at 997 (concluding that claims were "directed to an abstract idea" where "there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper").

---

[8]  Plaintiffs' counsel has characterized *UFRF* as "just about receiving data, medical data, from medical equipment and then essentially displaying it."  (*Nearmap* Action, Dkt. No. 52 at 40.)  Not so.  The claims in *UFRF* were directed to a method and system for converting data streams from "bedside devices" used in healthcare applications "'to a format independent'" of the data source using "drivers" that then allow for standardized data to be displayed on a GUI.  916 F.3d at 1366.  The *UFRF* patentee also argued that the claimed method provided greater accuracy and speed—and as is the case with avoiding the potential risks of manual roof measurement, the fact that this method could "'result in life altering consequences,'" while "laudable," "does not render it any less abstract."  *Id.* at 1367-68.

### (c)     The Claims Are Directed to a Desired Outcome

As further confirmation of their invalid nature, the claims from the FAC also fail the "desired outcome" test.  The "essentially result-focused, functional character of [their] claim language" establishes that these claims do not propose a specific solution to a technical problem. *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1296-97 (Fed. Cir. 2020); *see also Procon Analytics*, 2021 WL 1269081, at *8 (patent did "not pass muster under step 2 of *Alice* because it [did] not provide [a] technological solution" where "[d]espite using terms such as 'associating,' 'disassociating,' 'connection notice,' and 'communicative coupling,' these steps [did] not actually disclose how the result is achieved"); *Gabara v. Facebook, Inc.*, 484 F. Supp. 3d 118, 125-26 (S.D.N.Y. 2020) (dismissing claims as directed to "an abstract idea" where they merely "appl[ied] generic computer processes in some vaguely defined way").

Here, neither the claims nor specification teaches "how" to generate the claimed outcomes.  For instance, claim 1 of the '880 patent describes certain inputs (location information), as well as the desired outcome (an oblique image corresponding to that location)— but how is the inputted data used to select the correctly corresponding image?  Moreover, many claims are directed to the generation and/or modification of a 3D model based on the correlation of multiple images.  (*See, e.g.*, '436 patent claim 1; '568 patent claim 1; '840 patent claim 1; '149 patent claim 1; '152 patent claim 10; '960 patent claim 1.)  But how is that 3D model generated and modified?  Are there particular rules, algorithms, or approaches that should be used in these generating and modifying steps? Similarly, the Pitch Determination Claims all require pitch to be calculated—but how is that calculation performed?  Is particular computer code utilized to go from those unspecified inputs to the desired output?  The Patents-in-Suit do not answer any of

these questions.  The claims thus fail the "desired outcome" test and consequently fail *Alice* Step

1.  *See, e.g.*, *SynKloud*, 490 F. Supp. 3d at 826-27 (noting that "[r]esults-focused, functional

claim language has been a 'frequent feature' of claims found to be ineligible under § 101").

### (d)      The Claims Are Directed Merely to Data Manipulation

The Federal Circuit has repeatedly held that manipulation of data—such as images—to

produce a different form of data—such as a report—is inescapably abstract.  *See RecogniCorp,*

*LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) ("A process that start[s] with data,

add[s] an algorithm, and end[s] with a new form of data [i]s directed to an abstract idea."); *SAP*

*Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) ("[S]electing certain

information, analyzing it using mathematical techniques, and reporting or displaying the results

of the analysis . . . is all abstract.").  The claims of the Patents-in-Suit fit this rubric.

The below chart summarizes how multiple claims invoke this impermissible formulation:

| Claim | Data Selection/Collection | Apply Algorithm | Different Form of Data |
|---|---|---|---|
| '880 Patent, Claim 1 | "**first location data** generally corresponding to the location of the building"; | [Unspecified in claim] | "providing visual access to an **aerial image . . . corresponding to said first location data**, the aerial image taken from a straight down overhead view . . ."; |
| '436 Patent, Claim 1 | "receive a **first and a second aerial image** of a building having a roof, each of the aerial images providing a different view of the roof of the building"; | "**correlate** the first aerial image with the second aerial image"; | "generate, based at least in part on the correlation between the first and second aerial images, a **three-dimensional model** . . ."; and<br><br>"generate and transmit a **roof estimate report** . . .". |
| '152 Patent, Claim 10 | "receiving, via the marker, **an indication of a point** on the first aerial image; and" | [Unspecified in claim] | "**registering**, based on the received indication of the point, **the aerial image** to a reference grid corresponding to the three-dimensional model." |
| '149 Patent, Claim 1 | "receiving, based on alignment of the displayed interactive user interface control, **an indication** | "**modifying** a model of the roof based on the received | "**generating** and output a **roof estimate report** . . .". |

|  | **of the pitch** of the first planar roof section of the plurality of planar roof sections of the roof of the building"; | **indication of the pitch** of the first planar roof section; and" |  |
|---|---|---|---|
| '961 Patent, Claim 1 | "receive a plurality of **aerial images** of a building having a roof . . ." | "perform **image analysis** on at least two of the plurality of aerial images; | "generate a **roof report** that includes the pitch of each of the plurality of roof sections based on the calculated pitch; and . . ." |

Multiple recent cases have held that similar claims fail to satisfy *Alice* Step 1.  *See RDPA, LLC v. Geopath, Inc.*, No. 20-cv-3573 (LJL), 2021 WL 2440700, at *12 (S.D.N.Y. June 15, 2021) (granting motion to dismiss in part because patents were limited to "collection, analysis, and presentation of data"); *In re Gale*, No. 2020-2270, 2021 WL 1978973 (Fed. Cir. May 18, 2021) (affirming unpatentability of claims that were "directed to the abstract idea of (1) collecting information . . . (2) analyzing the information . . . and (3) reporting the results"); *Realtime Data*, 2021 WL 1752045, at *14 (granting motion to dismiss because "the focus of all the claims is still on the abstract operations of receiving, processing, and transmitting information").

### B.    The Claims of the Patents-in-Suit Fail Step 2 of the *Alice* Test

Because the claims of the Patents-in-Suit are written almost exclusively in functional language, and claim only "well-understood, routine, [and] conventional activity," they fail to satisfy *Alice* Step 2.  *See Alice*, 573 U.S. at 221, 225; *see also Yu* 1 F.4th at 1045 (claims failed Step 2 when they are "at a high level of generality and merely invoke[] well-understood, routine, conventional components to apply the abstract idea").  Plaintiffs contend that (1) the claimed technology was "revolutionary" or a non-obvious "breakthrough"; (2) the *Xactware* decisions support that argument; and (3) matching up points on non-stereoscopic images is the inventive concept.  Those arguments should be rejected.

### 1.    Evidence of Non-Obviousness or Novelty Is Irrelevant to *Alice* Step 2

The FAC relies heavily on the alleged novelty of the technology that allegedly embodies the Patents-in-Suit, and cites press reports from the early 2010s relating to Eagleview's commercial products as alleged indicia of their non-obviousness.  (*See, e.g.*, FAC ¶¶ 34, 35.) That should be rejected for three reasons.  *First*, the FAC does not identify any nexus between that praise and the particular claimed subject-matter—indeed, while the press reports emphasize "accurately measur[ing] lengths, pitches, valleys and other hard-to-see areas on roofs," the claim language of the Patents-in-Suit has nothing to do with measuring roof "valleys," makes no reference to "hard-to-see areas," and does not claim any particular accuracy level.  *See, e.g.*, *Yu*, 1 F.4th at 1044 (rejecting alleged inventive concept that had no basis in the actual claims).

*Second*, it is improper to conflate the novelty inquiry under Section 102 and 103 with the patentability inquiry under Section 101.  *WhitServe LLC v. Dropbox, Inc.*, 854 F. App'x 367, 373 (Fed. Cir. 2021) ("Objecti[ve] indicia of nonobviousness are relevant in a § 103 inquiry, but not in a § 101 inquiry."); *see also Yu*, 1 F.4th at 1045 ("But even if claim 1 recites novel subject matter, that fact is insufficient by itself to confer eligibility."); *Simio, LLC*, 983 F.3d at 1363-64 (noting that even if a particular "executable-process limitation" was novel, that "does not avoid the problem of abstractness"); *see also Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1340 (Fed. Cir. 2017) ("Eligibility and novelty are separate inquiries."); *Synopsys Inc.*, 839 F.3d at 1151 (noting that "a claim for a new abstract idea is still abstract").

*Third*, according to the '880 patent, "for many years" prior to 2009, "companies and products have offered such estimation services and reporting software reports using aerial imagery on which roofline outlines are traced, dimensions and areas are automatically based on

those tracings, and vertical elevations (via pitch or otherwise) are included in mathematical models." ('880 patent, 1:21-26.)  That disclosure forecloses any argument that the Patents-in-Suit were the first to use "aerial pictures of roofs" to create roof reports.  (FAC ¶ 35.)

### 2.    The *Xactware* Decisions and Related Arguments

Plaintiffs also contend that findings in the *Xactware* Action establish that the claims are patentable under Section 101.  (FAC ¶ 36.)  This should be rejected for several reasons.

<u>*First*</u>, there is limited overlap between the Court's *Xactware* decisions and the Patents-in-Suit.  None of the claims from the *Xactware* trial is expressly addressed in the FAC.  The '880 patent was not the subject of any *Xactware* decisions cited in the FAC (nor were any patents from that family).  Only three of the nine Patents-in-Suit were asserted at the *Xactware* trial.  And Plaintiffs sought vacatur of the very decisions upon which they rely in the FAC.  (*Neamap* Action, Dkt. No. 52 at 20:12-16.)

<u>*Second*</u>, the summary judgment decision cited in the FAC merely confirms the lack of an inventive step.  In that decision, the New Jersey Court found that "'[t]he claims are directed to methods and systems by which a user may: 1) specify points on two different, non-stereoscopic, aerial views of a roof or roof section; 2) have those points correlated to each other; 3) change locations of the specified points on the two aerial views; and 4) then have the software calculate the geometry in terms of slope, area, and perimeter of those roof views."  (FAC ¶ 36.)  That is just a recitation of the abstract idea itself.

Plaintiffs shifted tactics since that decision, and appear to argue now that the inventive concept is "unconventional correlations of non-stereoscopic images to generate roof reports with accurate information concerning a roof."  (FAC ¶ 26; *see id.* Ex. 10 at 10.)  But as noted above,

that allegedly inventive concept is not reflected in at least the claims of the '880 patent (nor is the formulation from the *Xactware* summary judgment decision).  Indeed, the only claim to make explicit reference to the use of non-stereoscopic images is the '436 patent.  Because the allegedly inventive concepts are not ***claimed***, Plaintiffs' contentions regarding *Alice* Step 2 should be rejected.  *See Yu*, 1 F.4th at 1045 (emphasizing that the any alleged inventive concept must be "***claimed***" and rejecting patentee's arguments at Step 2 because the alleged improvements, while "described in the specification," were not recited in the claims); *see also Teradata US, Inc. v. SAP SE*, No. 20-cv-06127-WHO, 2021 WL 326930, at *5 (N.D. Cal. Feb. 1, 2021) (*Alice* Step 2 not satisfied because "the inventive concepts [plaintiff] itself points to . . . are not themselves captured by the claim language or described in the specification").

*Third*, even assuming that the claims were directed to a new idea for making roof reports using non-stereoscopic images (which they are not), that idea is still abstract. *See, e.g.*, *Simio, LLC*, 983 F.3d at 1363-64 (holding that while "a claim directed to the idea of using graphics instead of programming to create object-oriented simulations," very well might be "a new idea," it was still abstract).

## V.   CONCLUSION

For the foregoing reasons, the FAC should be dismissed with prejudice in its entirety.

DATED:  April 11, 2022

_/s/ Samuel C. Straight_____

John M. Neukom (*pro hac vice* forthcoming)
Debevoise & Plimpton LLP
650 California Street
San Francisco  94108
Tel: (415) 738-5719
jneukom@debevoise.com

Edward L. Tulin (*pro hac vice* forthcoming)
Skadden, Arps, Slate,
Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
edward.tulin@skadden.com

Samuel C. Straight
Ray Quinney & Nebeker P.C.
36 South State Street, Ste. 1400
Salt Lake City, UT 84111
Tel.: 801-323-3390
Fax: 801-532-7543
sstraight@rqn.com

*Attorneys for GAF Materials LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 11, 2022, I caused a true and correct copy of the foregoing

brief to be served by email upon counsel of record listed below:

Jess M. Krannich
KIRKLAND & ELLIS
60 E. South Temple
Salt Lake City, UT 84111
801-877-8102
Email: jess.krannich@kirkland.com

Adam R. Alper
Brandon H. Brown
Natalie Flechsig
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
(415) 439-1400

Gianni Cutri
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Michael W. De Vries
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
(213) 680-8400

Leslie M. Schmidt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Dated:  April 11, 2022

*/s/ Brandy Sears*